**Paul W. CANTOR and Charles Gilbride, Plaintiffs,**

v.

**MULTIPLE LISTING SERVICE OF DUTCHESS COUNTY, INC., Defendant.**

No. 81 Civ. 2183 (JES).

United States District Court, S.D. New York.

July 25, 1983.

[redacted]

DeGraff, Foy, Conway, Holt-Harris & Mealey, Albany, N.Y., for plaintiffs; John T. DeGraff, Jr., David F. Kunz, F. Douglas Novotny, Albany, N.Y., of counsel.

Granik, Silverman, Sandberg, Kirschner, Campbell & Nowicki, New York, N.Y., for defendant; David W. Silverman, Carolyn A.M. Campe, New City, N.Y., of counsel.

## OPINION AND ORDER

SPRIZZO, District Judge.

Plaintiffs, Paul W. Cantor and Charles Gilbride, licensed real estate brokers, commenced this antitrust action against the Multiple Listing Service of Dutchess County, Inc. ("MLS"), a not-for-profit corporation of which they are member-brokers, alleging that various MLS bylaws which restrict their right to post "Century 21" lawn signs on property listed with MLS violate sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1–2 (1976), and sections 340 and 349 of the New York General Business Law, N.Y.Gen.Bus.Law §§ 340, 349 (McKinney 1968 & Supp. 1982–1983). Plaintiffs seek a declaratory judgment that the aforesaid bylaws are invalid and unenforceable, an injunction enjoining their enforcement, and costs, disbursements and attorneys' fees. The parties have submitted their controversy to the Court upon an agreed statement of facts.[1]

■ Plaintiffs are two of over six hundred licensed real estate brokers in the Dutchess County real estate market who compete for the right to list properties and to find buyers. See Agreed Statement of Facts at para. 19 ("ASF"); Trial Transcript at 6–7 ("Tr. _____").[2] In 1976, plaintiffs and some of their competitors formed the defendant, whose stated purpose is to increase cooperation among Dutchess County licensed real estate brokers and to promote better relations with the public by maintaining a service for the exchange of listings and information. ASF at paras. 4, 11, 16(a); Exhibit A to ASF, Article I, §§ 1–2. Defendant's members submit their listings to MLS which publishes them in a listing book which is disseminated to its more than 1,500 member-brokers and associated salespersons, all of whom may show and sell the property.[3] ASF at paras. 19, 24B, 24H; Tr. at 73–74.

MLS is a valuable marketing tool for the seller since it places at his disposal the services of over 1,500 brokers and salespersons, thus increasing the likelihood that his property will be sold. See Austin, *Real Estate Boards and Multiple Listing Systems as Restraints of Trade*, 70 Colum.L.Rev. 1325, 1353–59 (1970) (hereinafter "Austin"). It also benefits the buyer because the MLS compilation of listings provides him with a ready source of information regarding properties which may suit his needs. *Id.* Finally, MLS membership is also highly profitable for the brokers because they earn a share of the sales commission each time they locate a purchaser for a property listed with MLS or a property they have obtained the right to list is sold by another MLS broker or salesperson. See Tr. at 70–74. In fact, plaintiffs derive over ninety percent of their income from commissions earned in

---

1. The parties also were accorded an opportunity to present testimony on disputed issues.

2. Although plaintiff Gilbride deals primarily in residential real estate, Tr. at 22, and one of the bylaws complained of applies only to residential properties, the Court finds, for the reasons which follow, that the appropriate relevant product market for purposes of this case is real estate brokerage services for both residential and commercial properties. First, plaintiffs also challenge the validity of a bylaw which prohibits the posting of non-MLS "Sold" signs on all property which has been listed with it,

including commercial property. See Exhibit A to ASF, Art. XIII, Prohibitions, § 5. Secondly, plaintiffs do compete in the Dutchess County commercial real estate market, and their continued ability to do so may be adversely affected by their expulsion from MLS. Tr. at 20; *see* ASF at para. 22.

3. An MLS broker is under no obligation to list a property with MLS. Indeed, the listing is accepted into the system only with the consent of the owner, who presumably has discussed the marketing strategy with his broker. *See* ASF at para. 24A.

connection with homes listed with MLS. *See id.* at 22; ASF at para. 22.

Ever since its incorporation in 1976, MLS bylaws have, in one form or another, required that only the blue and white MLS sign be posted on property which is for sale. That sign contains, in bold letters, the words "For Sale," MLS' name and the listing broker's firm name and telephone number.[4] *Id.* at paras. 12, 21; Exhibit A to ASF, Article XIII, Prohibitions, § 3; Exhibits D and E to ASF; *see* Tr. at 33–34. These bylaws also provide for fines to be assessed against violators and for expulsion from membership for failure to pay such fines. ASF at paras. 13, 21; Exhibit A to ASF, Article XI, §§ 1–4; *see* Tr. at 29–30.

Plaintiffs also are parties to franchise agreements with "Century 21" ("Century 21"), a national organization of real estate brokers which has developed a brand image largely as a result of its advertising. ASF at paras. 2, 5; Tr. at 5–6. In connection with its advertising effort, Century 21 utilizes distinctive yellow, brown and white "For Sale" lawn signs which bear its name and distinctive logo and, in smaller print, the listing broker's firm name and telephone number.[5] ASF at para. 6; Exhibit E to ASF; Tr. at 10.

This action arises out of plaintiffs' efforts to utilize their Century 21 lawn signs, which they contend enhance their ability to capitalize on Century 21's brand image and constitute their most effective form of advertising.[6]

Prior to instituting the instant action, plaintiffs challenged the lawfulness of a predecessor bylaw, which is similar to the bylaw at issue here, in the Supreme Court of the State of New York, County of Dutchess, on the grounds that it violated section 340 of the New York General Business Law ("Donnelly Act") and the Sherman Act.[7] *See* ASF at para. 20; Tr. at 34. Justice Quinn of the Supreme Court held that the bylaw did not violate the Donnelly Act since its purpose was to enhance sales opportunities for the collective membership rather than to permit any one member to gain an edge through separate advertising. Exhibit B to ASF at 7. He also stated that, since the activity involved was exclusively intrastate, the Sherman Act claims need not be reached. *Id.* at 7–8.

Following the disposition of the state court action, defendant amended its bylaws. Article XIII, Prohibitions, Section 3 of those bylaws ("Section 3") now provides, *inter alia,*

ADVERTISING SIGNS AND RESIDENTIAL PROPERTIES. Only the standard blue and white 'For Sale' sign approved by the Multiple Listing Service of Dutchess County, Inc. may be erected or posted on any residential type property the listing of which has been submitted for distribution by the Multiple Listing Service and such sign may be erected only with the consent of the property owner. The listing member broker only shall have the responsibility and authority of erecting or posting said standard blue and white sign. It shall be a violation of these By-laws to erect or post any other type of advertising sign on any residential property the listing of which has been submitted for distribution by the Multiple Listing Service of Dutchess County, Inc.

---

4. The MLS sign allocates 50% of the advertising space to the member-broker. Tr. at 61; Exhibit D to ASF.

5. Approximately 80% of the advertising space is devoted to Century 21, with the broker's firm name and telephone number occupying only 20% of the sign. Tr. at 10–11; Exhibit E to ASF.

6. There are a variety of other forms of advertising available to plaintiffs, including placing advertisements in local, regional and/or national newspapers, obtaining a toll free telephone number with an answering service and placing listings in the Yellow Pages and the International Directory of Century 21 Agencies. Tr. at 11. Lawn signs are the most effective, both in terms of cost efficiency and production, i.e., the number of inquiries they generate. *Id.* at 10–12.

7. *Duhamel v. Multiple Listing Service of Dutchess County,* 108 Misc.2d 67, 436 N.Y.S.2d 922, Supreme Court of the State of New York, County of Dutchess, Special Term Part I.

PENALTY:

For non-compliance with Section 3 a fine of $100.00 per infraction will be imposed, payable to the service.

Exhibit A to ASF, Section 3 at 12. Section 5 of Article XIII, as amended, also proscribes the posting of any non-MLS "Sold" sign on a property that has been listed by MLS. Exhibit A to ASF, Article XIII, Prohibitions, § 5 ("Section 5").

Thereafter, plaintiffs erected their Century 21 signs on residential properties listed with MLS. ASF at para. 17. As a result, plaintiff Cantor was charged with twenty-six violations of Section 3 and plaintiff Gilbride was charged with eighty. *Id.* Both plaintiffs were charged with violations of Article XI, sections 1 through 4, as amended, which could result in their expulsion from membership in MLS in the event that any fines imposed as a consequence of these alleged violations are not paid.[8] *See id.;* Exhibit A to ASF, Article XI, §§ 1–4.

Plaintiffs commenced the instant action contending that the bylaws (1) unreasonably restrain commerce in violation of section 1 of the Sherman Act because they (a) limit plaintiffs' right to advertise in the manner they see fit and (b) minimize the competitive advantage they have gained *vis a vis* other brokers who are not associated with well known national organizations; (2) constitute an attempt to monopolize the real estate market in Dutchess County in violation of section 2 of the Sherman Act; and (3) violate sections 340 and 349 of the New York General Business Law.

Defendant first argues that the doctrines of *res judicata* and collateral estoppel bar plaintiffs' Sherman Act claims because Justice Quinn found (1) that the activity in- volved in the action before him was exclusively intrastate; and (2) that the challenged bylaw did not violate the Donnelly Act, which is subject to a rule of reason analysis similar to that applicable to the Sherman Act. That contention lacks merit.[9]

■ Pursuant to the doctrine of *res judicata* a prior final judgment on the merits is conclusive upon the parties in any subsequent action involving the same cause of action, both as to issues which were actually litigated and issues which might have been litigated. *E.g., Chicot County Drainage District v. Baxter State Bank,* 308 U.S. 371, 378, 60 S.Ct. 317, 320, 84 L.Ed. 329 (1940). Since the state court never rendered a final judgment on the merits of plaintiffs' federal claims, *res judicata* is no bar to their assertion here.

■ Collateral estoppel, on the other hand, bars parties from relitigating issues of fact or law which were actually litigated and determined in the prior action. *E.g., Allen v. McCurry,* 449 U.S. 90, 94, 101 S.Ct. 411, 414, 66 L.Ed.2d 308 (1980). Even assuming arguendo that the parties litigated and that the court determined that defendant's activities were entirely intrastate, plaintiffs are not estopped from litigating their Sherman Act claims. It is well settled that the Sherman Act extends not only to activities in interstate commerce but also to activities which, while wholly local in nature, nevertheless *substantially affect* interstate commerce. *See McLain v. Real Estate Board of New Orleans, Inc.,* 444 U.S. 232, 100 S.Ct. 502, 62 L.Ed.2d 441 (1980). That issue was neither litigated by the parties in the state court action nor determined by the state court.

---

8. Those sections provide, in pertinent part:
   Section 1.
   All individuals elected to membership agree by their acceptance of said membership to abide by the By-Laws and the Rules and Regulations of the Multiple Listing Service of Dutchess County, Inc., and subject themselves to the Provisions thereof.
   Section 4.
   Violation of Section 1 thru Section 3 of Article XI of these By-Laws shall be deemed a material breech [sic] of confidential relationship between the members hereof and grounds for expulsion from the Corporation, after a formal hearing by the Board of Directors.
   Exhibit A to ASF, Art. XI, §§ 1–4.

9. For the reasons set forth, *infra,* the Court does not reach the question whether *res judicata* or collateral estoppel bar plaintiffs' pendent state claims.

■ There are no stipulations regarding the effect of defendant's business activities on interstate commerce in the agreed statement of facts submitted to the state court. Exhibit A to Memorandum of Points and Authorities in Support of Plaintiffs' Motion for Summary Judgment ("Plaintiffs' Memorandum"). Moreover, plaintiffs never briefed the issue and defendant made only passing reference to it in its papers. Exhibit B to Plaintiffs' Memorandum; Defendant's [State Court] Memorandum of Law at 5–6, appended to Defendant's Reply Memorandum. Finally, there is no indication in Justice Quinn's opinion or order that he actually considered and determined that question. See Exhibit B to ASF. Accordingly, defendant's collateral estoppel argument must be rejected.[10]

■ Defendant next argues that the Court lacks jurisdiction over the Sherman Act claims since MLS neither engages in interstate commerce nor has a substantial effect on interstate commerce. That argument also lacks merit since it is clear, and the Court so finds, that MLS' activities have a substantial effect on at least three elements of interstate commerce, to wit, the financing of real estate transactions, the title insurance business and the interstate movement of people. See McLain, 444 U.S. at 245, 100 S.Ct. at 510.

The parties have stipulated that real estate brokers in Dutchess County, including MLS' member-brokers, provide services in connection with the purchase and sale of real property to persons moving into and out of New York. ASF at para. 25A; Tr. at 35. Indeed, in 1980 and 1981, between twenty-five and thirty-five percent of plaintiff Gilbride's multimillion dollar business involved sales and purchases to persons moving into and out of the state. Id. at 23–24; see id. at 5–6. Moreover, as part of

their services, brokers obtain a substantial amount of financing and title insurance from institutions which operate in interstate commerce. ASF at paras. 25C and 25D. As a result, substantial sums of money flow into and out of New York in the form of fees, deposits, down payments, premiums, mortgages and other financing arrangements. Id. at para. 25E.

Moreover, approximately twenty-three percent of all Dutchess County brokers are members of MLS. Id. at para. 19. Furthermore, during 1980 and the first six months of 1981, the total value of residential and commercial transactions concluded through MLS was $111,304,132.00. Id. It is apparent, therefore, that MLS brokers and their employees are engaged in a major portion of the real estate business transacted in Dutchess County, which business clearly has a substantial impact upon interstate commerce.

While defendant argues that it does not itself participate in or transact any of these brokerage activities, that circumstance is irrelevant. Defendant's activities cannot as a practical matter be isolated from the activities of its members. MLS exists solely to effect its members' goals and to service their needs and cannot function without its members' cooperation in submitting the listings which it distributes. See United States v. Realty Multi-List, 629 F.2d 1351 (5th Cir.1980).

■ Moreover, the Court further finds that defendant's own activities have a substantial effect on interstate commerce. In McLain, 444 U.S. 232, 100 S.Ct. 502, 62 L.Ed.2d 441 the Supreme Court stated, "Ultimately, whatever stimulates or retards the volume of residential sales or has an impact on the purchase price, affects the

---

**10.** Defendant's argument may lack merit for yet another reason. Collateral estoppel will not be invoked in the face of countervailing policy considerations which outweigh those underlying the collateral estoppel doctrine. See Restatement (Second) of Judgments, § 12 (1980). Since federal courts may have exclusive jurisdiction over actions arising under the antitrust laws, e.g., Turf Paradise, Inc. v. Arizo-

na Downs, 670 F.2d 813, 821 (9th Cir.), cert. denied, 456 U.S. 1011, 102 S.Ct. 2308, 73 L.Ed.2d 1308 (1982); Miller v. Granados, 529 F.2d 393, 395 (5th Cir.1976); Engelhardt v. Bell & Howell Co., 327 F.2d 30, 35 (8th Cir.1964), the need for a federal determination of issues of fact underlying antitrust claims renders it inappropriate for a federal court to be bound by a state court determination of these issues.

demand for financing and title insurance...." *Id.* at 246, 100 S.Ct. at 511. The Court finds that defendant's multiple listing service stimulates the volume of sales of residential and commercial properties by (1) facilitating the exchange of information; (2) making available to the seller an increased number of brokers who are authorized to show and sell the property, thereby increasing the number of prospective purchasers who will view the property; and (3) providing the broker and the purchaser with a time efficient vehicle for identifying properties which meet the buyer's needs. *See Austin, supra,* at 1356. This is more than sufficient to meet the standard enunciated by the Supreme Court.

There remains for consideration the question whether, on balance, the challenged bylaws unreasonably restrain trade.[11] *See CBS v. ASCAP,* 620 F.2d 930, 934 (2d Cir.1980), *cert. denied,* 450 U.S. 970, 101 S.Ct. 1491, 67 L.Ed.2d 621 (1981); *Chicago Board of Trade v. United States,* 246 U.S. 231, 238, 38 S.Ct. 242, 243, 62 L.Ed. 683 (1918). The Supreme Court has enumerated a number of factors which the Court must consider in assessing whether a restraint merely regulates or suppresses competition. These include the nature of the business to which the restraint is applied; its condition both before and after the restraint was imposed; the nature, effect and history of the restraint; the evil which it was intended to remedy; the reason for choosing the particular remedy and the end sought to be achieved. *Chicago Board of Trade,* 246 U.S. at 238, 38 S.Ct. at 243. A consideration of these factors leads to the conclusion that the bylaws in issue violate section 1 of the Sherman Act.

In pursuit of their brokerage activities in the Dutchess County real estate market, plaintiffs compete with other brokers to obtain listings and sell properties. In order to obtain a competitive advantage in attracting buyers and sellers, plaintiffs became franchisees of Century 21, hoping to capitalize on the goodwill and favorable brand image generated by that organization's distinctive advertising. Tr. at 6. They also joined MLS, which they contend is similarly vital to their business. *See id.* at 21.

There can be little question that, since Section 3 restricts plaintiffs' ability to advertise their services, it substantially impairs their freedom to conduct their businesses as they see fit. It is also clear that that restriction had a substantial adverse impact on plaintiffs' businesses. Plaintiff Gilbride testified, testimony which the Court accepts as credible, that during the three months in 1981 when he complied with Section 3, the number of inquiries he received decreased forty to fifty percent. *Id.* at 19–20. It follows that Section 3 largely vitiated any competitive advantage which plaintiffs endeavored to obtain by their franchise agreements with Century 21. The Court further finds that the regulation was designed to have precisely that effect. Indeed, defendant virtually conceded that its purpose was to increase the likelihood that other MLS member-brokers would have a better chance to earn a share of the sales commission. *See id.* at 64–69, 75; Defendant's Reply Memorandum at 8–9.

Moreover, defendant's past conduct demonstrates how important it was to defendant to insure that some member-brokers would not obtain any competitive advantage over other member-brokers with respect to properties listed with MLS. Thus, in 1976, defendant terminated its relationship with its predecessor's franchisor, the National Association of Realtors, an organization which prohibits any multiple listing service from making rules relating to the

---

**11.** The bylaws in issue are not so anti-competitive by nature and so devoid of redeeming value that they are presumed to be per se illegal. *Compare United States v. Socony Vacuum Oil Co.,* 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129 (1940) (price fixing); *International Salt Co. v. United States,* 332 U.S. 392, 68 S.Ct. 12, 92 L.Ed. 20 (1947) (tying arrangements); *Klor's, Inc. v. Broadway-Hale Stores, Inc.,* 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959) (group boycotts); *United States v. Topco Assoc.,* 405 U.S. 596, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972) (horizontal territorial division). Therefore, a rule of reason analysis is appropriate.

posting or use of signs.[12] It is certainly reasonable to infer that defendant took that action primarily if not solely because it could not retain membership in that organization while at the same time seeking to restrict the manner in which its member-brokers offered and advertised their properties for sale.

The Court finds, therefore, that Section 3 had and was designed to have an anti-competitive effect. However, there remains for consideration the question of whether the rule can be justified by a reasonable and legitimate purpose sufficient to outweigh its anti-competitive effect.

The arguments advanced by defendant to justify the rule are not persuasive. The fact that Section 3 may make it more likely that other, perhaps less diligent MLS member-brokers may have a better chance to attract buyers and thereby earn a share of the commissions is clearly not sufficient and only underscores its anti-competitive effects. Moreover, any legitimate corporate purpose defendant may have in alerting member-brokers and prospective purchasers to the fact that a property is listed with MLS can be achieved by simply requiring listing brokers to post their MLS "For Sale" signs no less conspicuously than they post their individual lawn signs. Tr. at 59–60.

Finally, defendant's argument that Section 3 preserves the aesthetic value of the property must be rejected. *Id.* at 60. While that argument might have some force if Section 3 prohibited numerous signs from being posted or merely regulated the manner in which lawn signs could be displayed, that is not the case. Section 3, as written, prohibits any sign other than an MLS sign, regardless of how displayed, and is far too broad to be justified by any legitimate purpose. The Court therefore concludes that Section 3 is an unreasonable restraint of trade in violation of section 1 of the Sherman Act.

Plaintiffs next contend that defendant is attempting to monopolize the real estate market in Dutchess County in violation of section 2 of the Sherman Act. To sustain that claim plaintiffs must demonstrate (1) a dangerous possibility that defendant will succeed in obtaining monopoly power in the relevant market; and (2) a specific intent to destroy competition or acquire monopoly power. *Times-Picayune Publishing Co. v. United States,* 345 U.S. 594, 626, 73 S.Ct. 872, 890, 97 L.Ed. 1277 (1953); *Nifty Foods Corp. v. Great Atlantic & Pacific Tea Co.,* 614 F.2d 832, 841 (2d Cir.1980).

The facts fall far short of demonstrating a section 2 violation. MLS' member-brokers' aggregate share of the market is no more than twenty-three percent.[13] That market share does not raise the dangerous possibility that MLS' members will be able to control prices or exclude competition. *See Nifty Foods Corp.,* 614 F.2d at 841; *United States v. Aluminum Co. of America,* 148 F.2d 416, 424 (2d Cir.1945). Moreover, plaintiffs have failed to demonstrate how the complained of bylaws can increase MLS' member-brokers' aggregate market share. Indeed, since plaintiffs are MLS brokers, whether the sale is effected through them or through other MLS member-brokers, there would be no net change in MLS' member-brokers' aggregate market share. Accordingly, the Court finds that plaintiffs have failed to demonstrate that defendant has attempted to monopolize in violation of section 2 of the Sherman Act.

Finally, plaintiffs contend that Section 3 violates sections 340 and 349 of the New York General Business Law. There

---

**12.** The National Association of Realtors' Handbook on Multiple Listing Policy, Supplement Number One, December 21, 1971, Rule 5, characterizes sign restrictions as inequitable limitations on its members and recognizes that such limitations have no reasonable relation to the functions of a multiple listing service. ASF at para. 14.

**13.** MLS' brokers and their associated salespersons account for approximately 22% of all the residential and commercial transactions concluded in Dutchess County. *See id.* at para. 19. Moreover, only some 23% of all licensed real estate brokers in Dutchess County are members of MLS. *See id.*

are serious questions as to whether plaintiffs' section 340 claim is barred by *res judicata* and collateral estoppel. Those questions can and should be passed upon by the state courts. In view of that circumstance, there is every reason for the state court to resolve plaintiffs' section 349 claim as well. This is especially true since the relief which the Court is prepared to afford plaintiffs pursuant to their Sherman Act claim is ample to protect their interests. The Court, therefore, declines to exercise pendent jurisdiction. *See United Mine Workers v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966).

Plaintiffs are entitled to judgment on their first cause of action. Sections 3 and 5 are hereby declared invalid and unenforceable insofar as they prohibit plaintiffs from posting their Century 21 signs on properties listed with MLS, and, to that extent, defendant is enjoined from enforcing them. Plaintiffs' causes of action two, three and four are dismissed. Plaintiffs shall have costs and disbursements. Each party shall bear its own attorneys' fees.

It is SO ORDERED.