FRAN WELCH REAL ESTATE
SALES, INC., Plaintiff,

v.

SEABROOK ISLAND
COMPANY, Defendant.

Civ. A. No. 82–2762–1.

United States District Court,
D. South Carolina,
Charleston Division.

Sept. 6, 1985.

Harry A. Swagart, III, Columbia, S.C., for plaintiff.

Gerald A. Connell, Washington, D.C., and Robert H. Hood, Charleston, S.C., for defendant.

## ORDER

HAWKINS, District Judge.

This civil antitrust action came on for hearing before the court on January 17, 1984, upon plaintiff's and defendant's cross-motions for summary judgment pursuant to Rule 56(c) and (e) of the Federal Rules of Civil Procedure. The plaintiff, Fran Welch Real Estate Sales, Inc. (hereinafter "Fran Welch"), is a real estate brokerage firm which does business on Kiawah, Seabrook and John's Islands, South Carolina. It was organized and licensed as a South Carolina corporation in February, 1981. This company is wholly owned by Mrs. Fran Welch and her husband.

The defendant, Seabrook Island Company (hereinafter "SIC"), is a South Carolina limited partnership. Since the early 1970's, SIC, or its predecessors-in-interest, has engaged in the development, promotion, and management of Seabrook Island as a private, residential resort community. As part of its business, SIC offers real estate sales and agency services to the public in connection with properties on Seabrook Island.

Seabrook Island is a 2100-acre tract of land situated along the South Carolina Coast about twenty-three miles south of Charleston, South Carolina. This island

has become one of the finest resort communities in the United States. Dwellings on Seabrook Island are confined to private, single and multi-family residences. Seabrook Island offers its residents and guests a variety of recreational services and facilities, including golf, tennis, swimming, boating, fishing, and horseback riding. The success of Seabrook Island is attributable in large part to its natural beauty and private, non-commercial character.

This action arises out of dispute between Fran Welch and SIC over the latter's business practices in the real estate brokerage business on Seabrook Island. The plaintiff's complaint, containing five counts, was filed on October 29, 1982, Count one, premised on Section 1 of the Sherman Act, 15 U.S.C. § 1, charges that SIC participated in a contract, combination, or conspiracy which has restrained competition in the market for real estate brokerage services. *Inter alia,* Fran Welch alleges that SIC participated in five specific business practices which are *per se* violations [1] of Section 1:

> (1) Restrictive deed covenants which prohibit all "For Sale" and "For Rent" signs on Seabrook Island;
>
> (2) SIC's policies which govern access onto Seabrook Island;
>
> (3) SIC's real estate broker referral program;
>
> (4) A "listback" provision in one of SIC's sales contracts; [2] and,
>
> (5) Exclusive dealing contracts between Seabrook Island property owners and SIC.

Count two, brought pursuant to Section 2 of the Sherman Act, 15 U.S.C. § 2, alleges that SIC has monopolized the market for real estate brokerage services on Seabrook Island.

Count three is a claim under South Carolina common law for intentional interference with Fran Welch's contractual relations.

Count four alleges that the acts complained of in counts one through three constitute unfair and deceptive trade practices in violation of the South Carolina Unfair Trade Practices Act (hereinafter "UTPA"), S.C.CODE ANN. §§ 39–5–10 *et seq.* (Law. Co-op 1985).

Count five sets forth a claim for a permanent and/or preliminary injunction against SIC.

SIC filed its answer on November 22, 1982. It denied all material allegations of the complaint and set forth other defenses.

Fran Welch filed its motion for partial summary judgment, or, in the alternative for a preliminary injunction on April 25, 1983. It argues that the five practices in Count one are *per se* violations of the Sherman Act and, therefore, violations of the U.T.P.A. Alternatively, it asserts that it is entitled to a preliminary injunction pursuant to Rule 65 of the Federal Rules of Civil Procedure.

On June 20, 1983, SIC cross-moved for summary judgment on all counts. Following extensive discovery, by way of depositions and interrogatories and the submission of voluminous affidavits and memoranda, the court scheduled and heard oral arguments on January 17, 1984. At that time, it denied Fran Welch's motion for partial summary judgment or, in the alternative, for a preliminary injunction. In addition, the court granted, in part, SIC's cross-motion for summary judgment. This order sets forth the reasons for the court's ruling.

At the outset, this court is mindful of the Supreme Court's admonition that "summary procedures should be used sparingly in complex antitrust litigation where motive and intent play leading roles, the proof is largely in the hands of the alleged conspirators, and hostile witnesses thicken the

---

**1.** Plaintiff also argues that the deed covenants violate the rule of reason and, therefore, it is entitled to summary judgment.

**2.** Fran Welch's complaint does not contain an allegation relating to this listback provision. Plaintiff formally moved to amend its pleading at the January 17th hearing to include this allegation.

plot." *Poller v. Columbia Broadcasting System, Inc.*, 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962). On the other hand, Rule 56(e), Federal Rules of Civil Procedure, requires a party resisting a properly supported motion for summary judgment to demonstrate the substance of the naked assertions contained in the complaint: "[A]n adverse party may not rest upon the *mere allegations or denials* of his pleading, but his response, by affidavits or as otherwise provided in this rule must set forth *specific facts* showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e) (emphasis added). In a case following the *Poller* decision, *First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968) (Marshall, J.), the court rejected the arguments that antitrust litigants are immune from summary proceedings or exempt from the requirements of Rule 56(e). Plaintiffs should not be allowed

> to get to a jury on the basis of the allegations in their complaints, coupled with the hope that something can be developed at trial in the way of evidence to support those allegations.... While we recognize the importance of preserving litigants' rights to a trial on their claims, we are not prepared to extend those rights to the point of requiring that anyone who files an antitrust complaint setting forth a valid cause of action be entitled to a full-dress trial notwithstanding the absence of any significant probative evidence tending to support the complaint.

391 U.S. at 289–90, 88 S.Ct. at 1592–93.

Indeed, the courts of the Fourth Circuit have not hesitated to grant summary judgment in antitrust cases where the defendant specifically refutes the allegations of a complaint and the plaintiff fails to produce significant probative evidence tending to show the existence of the alleged violations. *See e.g., Hester v. Martindale-Hubbell, Inc.*, 659 F.2d 433 (4th Cir.1981), *cert. denied*, 455 U.S. 981, 102 S.Ct. 1489, 71 L.Ed.2d 691 (1982); *Principe v. McDonald's Corp.*, 631 F.2d 303 (4th Cir. 1980); *Central Chemical Corp. v. Agrico Chemical Co.* 531 F.Supp. 533 (D.Md.1982); *Human Resources Institute of Norfolk, Inc. v. Blue Cross of Va.*, 484 F.Supp. 520 (E.D.Va.1980).

In moving for summary judgment, the defendant, in addition to citation to pertinent legal precedent, has set forth by way of detailed affidavits and exhibits uncontroverted facts which establish its right to judgment as a matter of law on part of the plaintiff's complaint. Fran Welch, in order to defeat this motion, must come forward with evidence which raises a genuine issue of material fact. It has failed to do this.

### SECTION 1 CLAIMS

Antitrust laws in general, and the Sherman Act in particular, are the Magna Carta of free enterprise. They are as important to the preservation of economic freedom and our free-enterprise system as the Bill of Rights is to the protection of our fundamental personal freedoms. And the freedom guaranteed each and every business, no matter how small, is the freedom to compete—to assert with vigor, imagination, devotion, and ingenuity whatever economic muscle it can muster. Implicit in such freedom is the notion that it cannot be foreclosed with respect to one sector of the economy because certain private citizens or groups believe that such foreclosure might promote greater competition in a more important sector of the economy.

*United States v. Topco Associates, Inc.*, 405 U.S. 596, 610, 92 S.Ct. 1126, 1135, 31 L.Ed.2d 515 (1972) (Marshall, J.).

Section 1 of the Sherman Act provides in relevant part:

> Every contract, combination in the form of trust or otherwise, or conspiracy, in the restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal....

15 U.S.C. § 1.

Read literally, Section 1 prohibits every agreement "in the restraint of trade." The United States Supreme Court, however, in *United States v. Joint Traffic Ass'n*, 171 U.S. 505, 19 S.Ct. 25, 43 L.Ed. 259 (1898),

recognized that Congress did not intend to prohibit *"every"* agreement which restrains trade. The reason for rejecting such a literal construction was articulated by Mr. Justice Brandies in *Board of Trade of City of Chicago v. United States,* 246 U.S. 231, 38 S.Ct. 242, 62 L.Ed. 683 (1918): "Every agreement concerning trade, every regulation of trade, restrains. To bind, to restrain, is of their very essence." 246 U.S. at 238, 38 S.Ct. at 243.

In order to properly administer the prohibition contained in Section 1, the courts developed two doctrines: (1) the rule of reason, and (2) the *per se* rule. Since *Standard Oil Co. of New Jersey v. United States,* 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911), most practices are analyzed under the so-called rule of reason. "As its name suggests, the rule of reason requires the factfinder to decide whether under all the circumstances of the case the restrictive practice imposes an *unreasonable* restraint on competition." *Arizona v. Maricopa County Medical Society,* 457 U.S. 332, 343, 102 S.Ct. 2466, 2472, 73 L.Ed.2d 48 (1982) (Stevens, J.) (emphasis added).

The classic formulation of the rule of reason is found in *Board of Trade of City of Chicago v. United States:*

> The true test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition. To determine that question the court must ordinarily consider the facts peculiar to the business to which the restraint is applied; its condition before and after the restraint was imposed; the nature of the restraint and its effect, actual or probable. The history of the restraint, the evil believed to exist, the reason for adopting the particular remedy, the purpose or end sought to be attained, are all relevant facts. This is not because a good intention will save an otherwise objectionable regulation or the reverse; but because knowledge of intent may help

the court to interpret facts and to predict consequences.

246 U.S. at 238, 38 S.Ct. at 243.

While a court must consider all the facts, the proper focus is "directly on the challenged restraint's impact on competitive conditions." *National Society of Professional Engineers v. United States,* 435 U.S. 679, 688, 98 S.Ct. 1355, 1363, 55 L.Ed.2d 637 (1978) (Stevens, J.). Simply stated, a court must determine a practice's anticompetitive and procompetitive purposes and effects from all the facts and circumstances. If the anticompetitive features outweigh the procompetitive features, then the practice is an unreasonable restraint of trade.

This inquiry, however, into the reasonableness of a practice has high costs for the litigants and the judicial system:

> Litigation of the effect or purpose of a practice often is extensive and complex. Judges often lack the expert understanding of industrial market structures and behavior to determine with any confidence a practice's effect on competition. And the result of the process in any given case may provide little certainty or guidance about the legality of a practice in another context.

*Arizona v. Maricopa County Medical Society,* 457 U.S. 332, 343, 102 S.Ct. 2466, 2472, 73 L.Ed.2d 48 (1982) (citations omitted).

To reduce this cost, courts employ the use of *per se* rules:

> [T]here are certain agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use. This principle of *per se* unreasonableness not only makes the type of restraints which are proscribed by the Sherman Act more certain to the benefit of everyone concerned, but it also avoids the necessity for an incredibly complicated and prolonged economic investigation into the

entire history of the industry involved, as well as related industries, in an effort to determine at large whether a particular restraint has been unreasonable—an inquiry so often wholly fruitless when undertaken.

*Northern Pacific R. Co. v. United States,* 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958) (Black, J.).

*Per se* rules require a court to make generalizations about the social utility of a given business practice.

The probability that anticompetitive consequences will result from a practice and the severity of those consequences must be balanced against its procompetitive consequences. Cases that do not fit within the generalization may arise, but a *per se* rule reflects the judgment that such cases are not sufficiently common or important to justify the time and expense necessary to identify them.

*Continental T.V., Inc. v. G.T.E. Sylvania, Inc.,* 433 U.S. 36, 50, n. 16, 97 S.Ct. 2549, 2557, n. 16, 53 L.Ed.2d 568 (1977). While a resort to *per se* rules is efficacious and beneficial to litigants, judges and the public, "[i]t is only after considerable experience with certain business relationships that courts classify them as *per se* violations of the Sherman Act." *United States v. Topco Associates, Inc.,* 405 U.S. 596, 607–8, 92 S.Ct. 1126, 1133, 31 L.Ed.2d 515 (1972). Once courts gain the experience, the presumption is conclusive; there is *no* justification that will save the restraint. Business certainty and litigation efficiency are favored even in cases where a trial might prove the restraint reasonable. "Because the presumption is a conclusive one, a new *per se* rule is not justified until the judiciary obtains considerable *rule of reason experience* with [the] particular type of restraint challenged." *Arizona v. Maricopa County Medical Society,* 457 U.S. 332, 349, 102 S.Ct. 2466, 2475, n. 19, 73 L.Ed.2d 48 (1982) (emphasis added).

Therefore, the clear mandate is that a practice is not subject to *per se* classification unless it is predicated by considerable rule of reason experience. This is not to say that *per se* rules must be created for each industry. Rather, the focus is on the challenged *practice,* whatever the business setting.

*Covenants Against the Use of Signs.*

Property on Seabrook Island is and has been sold subject to a set of protective covenants agreed to by SIC and each property owner. These covenants contain a number of provisions governing the appearance of property on the island. The covenants prohibit all commercial signs, including "For Rent" and "For Sale" signs. The covenants also prohibit, *inter alia,* walls and fences, antennas and flag poles, outbuildings (such as trailers, campers, shacks, and tents), and visible garbage or rubbish receptacles.

Fran Welch has moved for summary judgment regarding the covenants insofar as they prohibit its use of "For Sale" and "For Rent" signs on the island, alleging that the covenants are, alternatively, *per se* violations of Section 1 of the Sherman Act or violations under the rule of reason. SIC has cross-moved for summary judgment.

The covenant's restrictions on real estate signs are one aspect of an integrated set of restrictions, all of which are aimed at preserving a consistent and pleasing physical appearance of property on the island. SIC has adduced evidence that the sole purpose of the covenants was aesthetic, designed to preserve the natural beauty and noncommercial character of the island, and that the covenants were not intended to harm the business of any real estate agents or brokers. Despite considerable discovery, the plaintiff has come forward with no contrary evidence. The anti-sign covenants apply without discrimination to all real estate agents, and prevent SIC as well as Fran Welch from utilizing signs on the island.

The restrictions against signs benefit the island's residents, who desire and support them. The covenants were endorsed on January 14, 1983, by a unanimous resolution of the Board of Directors of the Seabrook Island Property Owners Association, an independent governing body controlled

by the island's property owners and not by SIC. Property owners have purchased their homes on the island in reliance on the expectation that the protective covenants would keep not only their own property, but their neighbors' as well, free of commercial signs.

The uncontradicted evidence, including admissions by Fran Welch, herself, establishes that real estate agents have at their disposal a variety of effective means other than lawn signs by which to advertise their services, solicit business, and sell properties on Seabrook Island. These include, among others, direct mailings, newspaper and magazine advertisements, radio and television advertisements, billboard advertisements, listings in telephone and real estate directories, open houses, telephone solicitations, participation in multiple listing services, conveniently located offices, personal or social contacts, and word-of-mouth.

Other resort developments in the Charleston area also enforce restrictions against commercial signs, and the Seabrook Island covenants assist that development to maintain its competitive position against such developments as Kiawah Island and others.

■ In summary, the Seabrook Island covenants against commercial signs serve a legitimate purpose, and the plaintiff has come forward with no evidence that the covenants have anticompetitive purposes. Nor is there evidence of anticompetitive effect from the nondiscriminatory denial of one advertising medium to all comers, since a variety of other promotional means are available to real estate brokers competing on Seabrook Island. Advertising restrictions that are anticompetitive neither in purpose nor in effect have been held not to violate the Sherman Act. *Gough v. Rossmoor Corp.*, 585 F.2d 381 (9th Cir.1978), *cert. denied*, 440 U.S. 936, 99 S.Ct. 1280, 59 L.Ed.2d 494 (1979); *ALW, Inc. v. United Airlines, Inc.*, 510 F.2d 52 (9th Cir.1975).

Fran Welch relies principally on *Cantor v. Multiple Listing Service of Dutchess County, Inc.*, 568 F.Supp. 424 (S.D.N.Y. 1983), but that case is clearly inapposite. In *Cantor*, an association of competing real estate agent brokers formed a multiple listing service whose by-laws required that members utilize the service's standard sign and no others. 568 F.Supp. at 427–28. In contrast, the covenants at issue here prohibit all signs, including the defendant's as well as the plaintiff's. In *Cantor*, the by-laws' prohibition on some signs while permitting others allowed the court to conclude that the restriction's purpose was not aesthetic; the permitted signs were as unsightly as the prohibited signs. Here, the blanket prohibition on all signs is consistent with the covenants' aesthetic purpose. Finally, the *Cantor* restrictions were imposed by a group of horizontal competitors, without the participation of the property owners. Horizontal restraints are particularly suspect under Section 1 of the Sherman Act. *United States v. Topco Associates*, 405 U.S. 596, 608, 92 S.Ct. 1126, 1133, 31 L.Ed.2d 515 (1972). Here, by contrast, the protective covenants are not alleged to be the product of an agreement between SIC and any other competitor, and they are joined in and desired by the property owners themselves.

In summary, there is no genuine dispute as to any issue of material fact regarding the protective covenants, and the plaintiff's motion for summary judgment regarding the covenants should, therefore, be denied, and the defendant's motion should be granted.

*Access Policies.*

The plaintiff alleges that SIC has used its asserted control over Seabrook Island's security access procedures to inhibit competition from other real estate agents, and has moved for summary judgment. SIC has cross-moved for summary judgment. The plaintiff's claim is that SIC has used the island's access control system at its main gate to prevent or inhibit the ability of competing agents to gain admittance to the island.

The privacy and security of Seabrook Island is highly regarded and valued by the

property owners, enhancing both the enjoyment and resale value of their properties, and is a positive selling point to many potential buyers considering the purchase of Seabrook Island properties. The plaintiff itself has promoted Seabrook Island properties on the basis of the island's "privacy" and the fact that access is assertedly "severely restricted."

The plaintiff has presented no evidence that the island's access policies and procedures unreasonably impede the ability of brokers to enter the island and conduct business. The policies are routinely and willingly complied with by most outside brokers, and there is no evidence that they are applied in a discriminatory manner or with an intent to cause business harm to particular brokers, including the plaintiff.

There is no evidence in this record of a pattern or practice of misuse of the island's security procedures for anticompetitive purposes. The plaintiff has identified no instances in which its agents were denied access to the island, and only one alleged instance of "rude" treatment of one of its rental clients. The only other evidence of misuse of access procedures is the statement of another Charleston agent that its personnel experienced difficulty in obtaining access on two occasions, only one of which resulted in denial of access. Even if true, these allegations, which encompass a period of several years, are insufficient to establish systematic or deliberate misuse of the island's security system.

Fran Welch also complains that it and other real estate brokers are limited to no more than three agents on the island at one time, and that SIC agents are issued passes while other agents must obtain clearance at the security gate. The plaintiff's president, however, was unable to identify any instance in which the three-agent rule deprived the plaintiff's employees of access to the island. The plaintiff's president maintains no records, and could not recall at her deposition, as to how many times she herself has gained access to the island. No inference of discrimination or anticompetitive motive can be drawn from the issuance

of permanent passes to SIC agents but not to outside agents. SIC presumably knows the identity and trustworthiness of its own employees, and they can be permitted to come and go without compromising the island's security procedures. SIC cannot vouch for the credentials of employees of other firms, and it is reasonable to require that such persons present identification and evidence of authorization before being admitted through the island's security gate.

The island's system of controlled access was adopted and established by the Board of Directors of the Property Owners Association solely for the purpose of maintaining privacy and security on the island by reasonably regulating the manner and conditions under which entry is permitted and not for the purpose of harming or causing competitive injury to the plaintiff or any other real estate broker. Access policies and procedures, which are the responsibility of the Property Owners Association and not the defendant, have been consistently supported by the property owners.

■ The plaintiff has cited no cases treating analogous claims as *per se* violations; the access policy allegation must therefore be judged under the rule of reason. Because the plaintiff has come forward with no evidence that the Seabrook Island access policies are anticompetitive in either purpose or effect, and because the uncontradicted evidence is to the contrary, the plaintiff's motion for summary judgment should be denied, and the defendant's motion should be granted.

### Broker Referral Policy.

SIC has maintained different policies, at different times, with respect to its relationship with competing real estate brokers. At the present time, SIC is a member of the Charleston Multiple Listing Service ("MLS"), and accepts referrals from other brokers, including the plaintiff, who are also members of the MLS.

Prior to joining the MLS, SIC maintained a broker referral policy whereby other real estate brokers were invited (after written

application and approval by SIC) to refer potential buyers for SIC listings. If a sale was made, SIC would pay the referring broker a referral fee. SIC at one time made its broker referral program available only to brokers who did not accept listings of their own on Seabrook Island. SIC deleted that requirement in August 1982, prior to the filing of this lawsuit.

Fran Welch alleges that the now-discontinued condition in SIC's broker referral program constitutes a *per se* violation of Section 1 of the Sherman Act, and has moved for summary judgment.

The plaintiff's claim is based on the contention that the SIC broker referral policy is analogous to an illegal group boycott. Such a boycott occurs when "businessmen concert their actions in order to deprive others of access to merchandise which the latter wish to sell to the public...." *United States v. General Motors Corp.*, 384 U.S. 127, 146, 86 S.Ct. 1321, 1331, 16 L.Ed.2d 415 (1966). A boycott "depriv[es] petitioners of a valuable business service which they needed in order to compete effectively...." *Silver v. New York Stock Exchange*, 373 U.S. 341, 347, 83 S.Ct. 1246, 1252, 10 L.Ed.2d 389 (1963).

■ Two hallmarks of an illegal group boycott therefore are (1) denial to the plaintiff of access to a competitively useful commodity (2) which is caused by a collective refusal to deal with the plaintiff. There is evidence of neither element in this record.

There is no evidence that Fran Welch has been denied access to real estate on Seabrook Island for sale or rent to its clients. The SIC policy of accepting referrals only from brokers who did not themselves list property on the island, if anything, facilitated the plaintiff's access to its own listings on the island by reducing the number of brokers competing with the plaintiff for those listings.

Fran Welch argues that the broker referral policy shrinks the inventory of listings by other brokers on Seabrook Island available to Fran Welch for co-brokerage. As of July 20, 1982, only 59 brokers in the Charleston area and the rest of South Carolina had signed up for the referral program. One of the plaintiff's witnesses estimates that there are 300–600 real estate agents in the Charleston area alone. The plaintiff has presented no evidence that it has actually experienced difficulty in obtaining access to properties on a co-brokerage basis. In the absence of evidence that SIC's policies denied the plaintiff access to the product it wished to sell, it cannot be concluded that the policy injured either competition or the plaintiff. *Gibbons, Inc. v. Crawford Fitting Co.*, 704 F.2d 787, 792 (5th Cir.1983).

The second element of a group boycott—refusal to deal with the plaintiff—is also absent from this record. The participating brokers did not refuse to deal with Fran Welch; they refused to accept listings for Seabrook Island property. There is thus no evidence that the policy was directed at, or injured, the plaintiff.

SIC has presented evidence that its limitation on listing brokers was pursuant to legitimate and reasonable business purposes. SIC believed that brokers with their own listings on Seabrook Island would make every effort to sell those listings to any prospective buyers, thus realizing a full commission. SIC believed that such brokers would refer prospective buyers to SIC only as a last resort, because the referring broker would then receive only a share of the sales commission rather than the entire commission. SIC believed that such unenthusiastic referrals would not substantially augment its own sales efforts. The plaintiff has come forward with no evidence of an anticompetitive purpose for the broker referral policy. Anticompetitive purpose is another identifying mark of a *per se* illegal group boycott, and there is no evidence of such a purpose here. *McQuade Tours, Inc. v. Consolidated Air Tour Manual Committee*, 467 F.2d 178, 187 (5th Cir.1972), *cert. denied*, 409 U.S. 1109, 93 S.Ct. 912, 34 L.Ed.2d 690 (1973).

■ In summary, there is no evidence that SIC's now-discontinued condition on its broker referral program denied the plain-

tiff access to Seabrook Island properties, that it constituted a collective refusal to deal with the plaintiff, or that it had an anticompetitive purpose. The plaintiff's motion for summary judgment on this issue should be denied, and the defendant's motion should be granted.[3]

### Listback Tying Arrangements.

 Fran Welch alleges that SIC has violated Section 1 of the Sherman Act by conditioning the sale of land on Seabrook Island on the purchasing builders' agreement to utilize the real estate brokerage services of SIC. Although this claim has not been pled in the complaint, both parties have moved for summary judgment. The plaintiff asserts that these alleged "listback" agreements constitute tying arrangements that are illegal *per se.* An illegal tying arrangement requires a showing that the defendant possesses " 'appreciable economic power' in the market for the tying product." *United States Steel Corp. v. Fortner Enterprises, Inc.,* 429 U.S. 610, 611–12, 97 S.Ct. 861, 863–64, 51 L.Ed.2d 80 (1977). There is at present insufficient evidence in this record to permit a determination of the relevant market in which the tying arrangement is alleged to have occurred, or of SIC's economic power, if any, in that market. Both motions for summary judgment should therefore be denied, without prejudice to either party's renewal of its motion for summary judgment after more discovery has been completed.

### Exclusive Dealing Contracts.

The complaint alleges that SIC has violated Section 1 of the Sherman Act by inducing certain Seabrook Island property owners to enter into agreements giving SIC the exclusive right to list and sell their property on the island.

 Exclusive listing agreements are a form of exclusive dealing contracts, and it is settled law that exclusive dealing contracts are not illegal *per se.* *See, e.g., Satellite Television & Associated Resources, Inc. v. Continental Cablevision of Virginia, Inc.,* 1982–2 Trade Cas. (CCH) ¶ 64,733 (E.D.Va.1982), *aff'd,* 714 F.2d 351 (4th Cir.1983). Rather, such contracts are judged by the rule of reason, which requires an assessment of whether a particular practice, on balance, promotes or suppresses competition. *Board of Trade of City of Chicago v. United States,* 246 U.S. 231, 238, 38 S.Ct. 242, 243, 62 L.Ed. 683 (1918); *National Society of Professional Engineers v. United States,* 435 U.S. 679, 691, 98 S.Ct. 1355, 1365, 55 L.Ed.2d 637 (1978). In applying the rule of reason to exclusive dealing agreements, courts have focused on the extent to which "performance of the contract will foreclose competition in a substantial share of the relevant market." *Satellite Television,* 1982–2 Trade Cas. at ¶ 71,566; *Tampa Electric Co. v. Nashville Coal Co.,* 365 U.S. 320, 327, 81 S.Ct. 623, 628, 5 L.Ed.2d 580 (1961).

Assessment of the degree of market foreclosure caused by an exclusive dealing contract requires delineation of the relevant product and geographic markets in which such foreclosure has allegedly occurred. The plaintiff has to date come forward with no evidence that Seabrook Island is a relevant geographic market, other than the conclusory assertions of its own president and of one other Charleston area real estate agent. The court will reserve judgment on this issue pending further discovery in connection with the plaintiff's claims under Section 2 of the Sherman Act. Even assuming *arguendo* that Seabrook Island is a relevant geographic market, however, the undisputed material facts establish that SIC's exclusive listing agreements do not substantially foreclose competition.

SIC's exclusive listing agreements are of short duration; they expire after six

---

**3.** The complaint also alleges that participation in SIC's broker referral policy was also conditioned upon agreement by the participating brokers not to sell the listings of other brokers on Seabrook Island. No such requirement appears in any statement of the policy, and the plaintiff has presented no evidence that such a requirement actually existed. The defendant's motion for summary judgment, therefore, should be granted with regard to this claim as well.

months. Competing real estate agents can and do compete with SIC for exclusive listings initially and upon the expiration of the agreement, if no buyer has been found. It is highly unlikely that agreements of such a short term unreasonably restrain competition. *See, e.g., FTC v. Motion Picture Advertising Service Co.*, 344 U.S. 392, 73 S.Ct. 361, 97 L.Ed. 426 (1953); *Fleer Corp. v. Topps Chewing Gum, Inc.*, 658 F.2d 139 (3d Cir.1981), *cert. denied*, 455 U.S. 1019, 102 S.Ct. 1715, 72 L.Ed.2d 137 (1982); *Lawlor v. National Screen Service Corp.*, 270 F.2d 146 (3d Cir.1959), *cert. denied*, 362 U.S. 922, 80 S.Ct. 676, 4 L.Ed.2d 742 (1960). Many new listing opportunities arise as new properties come on the market and as existing exclusive listing agreements expire. Given the steady supply of new listing opportunities, SIC's exclusive listing agreements cannot reasonably be viewed as a substantial restraint on competition. *American Football League v. National Football League*, 205 F.Supp. 60 (D.Md. 1962), *aff'd*, 323 F.2d 124 (4th Cir.1963).

▮ Ease of entry in an industry also negates any inference of competitive injury from exclusive dealing agreements. *Columbia Broadcasting System, Inc. v. FTC*, 414 F.2d 974 (7th Cir.1969), *cert. denied*, 397 U.S. 907, 90 S.Ct. 903, 25 L.Ed.2d 88 (1970). The real estate industry in the Charleston area is characterized by negligible entry barriers, numerous competitors, and frequent new entry. New real estate agents are constantly licensed in South Carolina and enter the marketplace. Such agents are able to obtain listings through relatively inexpensive means. A number of Charleston area agents, including Fran Welch, have competed with SIC on Seabrook Island.

There are valid and procompetitive business reasons for exclusive listing agreements. Such agreements, as utilized on Seabrook Island, benefit both the real estate agent and the property seller, protecting the agent from the risk of a wasted investment of time and money and providing the property seller with assurance that the agent will utilize his or her best efforts to market the property.

For these reasons, the use of exclusive listing contracts is a common practice in the real estate industry and is recognized and accepted by real estate commissions throughout the country. The National Association of Realtors recommends the use of exclusive listing agreements, and recognizes that such agreements promote competition and the interests of sellers. Fran Welch itself solicits and utilizes exclusive listing agreements in selling property on Seabrook Island.

▮ In summary, the plaintiff has failed to come forward with the facts that demonstrate the existence of disputed issues of material fact as to SIC's use of exclusive listing agreements, and summary judgment for the defendant on this claim is warranted.

### Miscellaneous Conduct.

The plaintiff alleges that SIC has engaged in various miscellaneous anticompetitive acts in connection with its asserted plan to restrain trade and eliminate competition, such as misinforming property owners, threatening sham trademark litigation, disparaging plaintiff's business reputation, requiring brokers to dislcose confidential information, rudely treating plaintiff's rental clients, manipulating its own amenities policies in a discriminatory manner, and changing its access policies with proper notification to outside brokers.

▮ The plaintiff has produced virtually no evidence to support any of these contentions, either in isolation or in connection with any plan to restrain trade and eliminate competition, which plaintiff also has not shown. Nor has Fran Welch cited any cases to support its position that these activities rise to the level of *per se* violations. Judged, as they must be, under a rule of reason analysis, these acts, insofar as they may be true, have not been shown to be anticompetitive either in purpose or in effect. The plaintiff's motion for summary judgment with respect to these acts should

be denied, and the defendant's motion should be granted.

## SECTION 2 CLAIMS

■ Count 2 of the complaint alleges that SIC has violated Section 2 of the Sherman Act by monopolizing and attempting to monopolize a market consisting of Seabrook Island. The defendant has moved for summary judgment as to Count 2. As noted above, there is insufficient evidence at present to permit a determination as to whether Seabrook Island does or does not constitute a relevant market, and the defendant's motion, therefore, should be denied, without prejudice to its renewal of that motion after the close of discovery.

## STATE LAW CLAIMS

Count 3 of the complaint alleges that SIC has intentionally interfered with the contractual relations of Fran Welch, and Count 4 of the complaint alleges that SIC has violated the South Carolina UTPA, S.C. CODE ANN. § 39–5–10 *et seq.* The plaintiff has moved for summary judgment on both Counts 3 and 4. Both of these claims seek to invoke this court's pendent jurisdiction. As the court will retain jurisdiction over some of the plaintiff's federal antitrust claims, the cross-motions for summary judgment regarding the pendent state claims should be denied at this time until the remaining federal claims are finally resolved.

## INJUNCTIVE RELIEF

Fran Welch has moved for preliminary injunctive relief as to those claims for which it also seeks summary judgment. As summary judgment will be granted to the defendant for all of those claims with the exception of the list-back tying arrangement claim, the motion for a preliminary injunction as to those claims should be denied. The plaintiff's motion for a preliminary injunction with regard to the tying arrangement claim should also be denied, as the plaintiff has failed to demonstrate either a probability of success on the merits or irreparable injury to itself. *Black-*

*welder Furniture Co. of Statesville, Inc. v. Seilig Manufacturing Co., Inc.,* 550 F.2d 189 (4th Cir.1977); *North Carolina State Ports Authority v. Dart Containerline Co. Ltd.,* 592 F.2d 749 (4th Cir.1979).

## CONCLUSION

Based upon the above, it is, therefore,

ORDERED, that plaintiff's motion for partial summary judgment, or, in the alternative, for a preliminary injunction be, and the same is hereby, denied. It is

ORDERED FURTHER, that defendant's cross-motion for summary judgment be, and the same is hereby, granted as to Count 1 of the complaint, alleging violations of Section 1 of the Sherman Act, 15 U.S.C. § 1. It is

ORDERED FURTHER, that defendant's cross-motion for summary judgment as to the plaintiff's claim of tying brokerage services to the sale of land, and as to Count 2 of the complaint alleging violations of Section 2 of the Sherman Act, 15 U.S.C. § 2, be, and the same is hereby, denied, with leave for either party to renew its motion for summary judgment as to such claims upon completion of discovery. It is

ORDERED FURTHER, that defendant's cross-motion for summary judgment as to Count 3 of the complaint, alleging intentional interference with contractual relations, and as to Count 4 of the complaint, alleging violations of the South Carolina Unfair Trade Practices Act, S.C.CODE ANN. § 39–5–10 *et seq.,* be, and the same is hereby, denied at this time. Counts 3 and 4 of the complaint allege violations of state law and seek to invoke this court's pendent jurisdiction. The court has at this time retained jurisdiction over certain of the plaintiff's claims of violations of the Sherman Act and will, therefore, retain jurisdiction over the pendent state claims until such time as a final determination of these remaining federal claims is rendered.

AND IT IS SO ORDERED.