**FAULKNER ADVERTISING ASSOCIATES, INC., Plaintiff–Appellant,**

v.

**NISSAN MOTOR CORPORATION IN U.S.A., Defendant–Appellee.**

No. 89–1548.

United States Court of Appeals, Fourth Circuit.

Argued April 2, 1990.

Decided June 12, 1990.

Robert Gene Levy, Frank, Bernstein, Conaway & Goldman, Baltimore, Md., for plaintiff-appellant.

John J. Hanson, Gibson, Dunn & Crutcher, Los Angeles, Cal., for defendant-appellee.

Berryl A. Speert, Harry J. Katrichis, A. David Demiray, Frank, Bernstein, Conaway & Goldman, Baltimore, Md., on the brief, for plaintiff-appellant.

Peter Sullivan, Robert W. Denton, Gibson, Dunn & Crutcher, Los Angeles, Cal., Lewis A. Noonberg, H. Mark Stichel, Piper & Marbury, Baltimore, Md., on the brief, for defendant-appellee.

Before ERVIN, Chief Judge, HALL, Circuit Judge, and BUTZNER, Senior Circuit Judge.

ERVIN, Chief Judge:

Faulkner Advertising Associates, Inc. ("Faulkner") brought this action against Nissan Motor Corporation in U.S.A. ("Nissan"), alleging that Nissan was engaged in an illegal "tying" arrangement in violation of the Sherman Antitrust Act, 15 U.S.C. §§ 1 *et seq.* The district court granted Nissan's motion to dismiss this case under Federal Rule of Civil Procedure 12(b)(6) because of Faulkner's failure to state a

claim upon which relief could be granted. In particular, the district court held that Faulkner had failed to allege in its complaint all of the essential elements of a tying violation, especially Nissan's sale of a "tied" product. We believe that Faulkner's complaint stated a cause of action sufficient to withstand a motion to dismiss, and therefore reverse the decision of the district court and remand this case for trial.

## I.

Faulkner is an advertising agency located in Baltimore, Maryland. Until October of 1988, Faulkner was engaged exclusively in the business of creating and placing print, radio and television advertising for local Nissan dealer associations. By that time, Faulkner earned approximately forty to fifty percent of the total amount spent on advertising each year by these independent dealer associations.[1] Prior to 1988, advertising for Nissan trucks and cars was conducted at two distinct levels—national advertising and advertising in selected "spot" markets was developed, placed and paid for by Nissan, while regional and local advertising was obtained and paid for by the individual Nissan dealerships through their local dealer associations.[2] Under this older system, the local dealer associations were free to procure advertising services from any advertising agency of their choosing.

On May 27, 1988, Nissan announced a new "local market advertising" plan that was implemented on October 1, 1988. Under this new approach, Nissan increased the wholesale prices of its cars and trucks in order to pay for both increased advertising at the national level, and new advertising to be developed by Nissan and its national advertising agency, Chiat/Day, Inc. ("Chiat/Day"), for use at the regional and local levels.[3] In addition, Nissan also ceased making its monetary distributions and contributions to the advertising efforts of the local dealer associations. Although the independent Nissan dealer associations were not precluded from developing and placing local advertising, these activities were no longer subsidized by Nissan or the sale of Nissan vehicles. As a consequence, the local Nissan dealer associations terminated, in many cases with considerable reluctance, their business relationships with Faulkner and the other advertising agencies which they previously had retained.

Faulkner sustained substantial and immediate economic losses as a result of Nissan's new program, which effectively centralized all aspects of Nissan advertising at the national and regional levels.[4] On October 6, 1988, Faulkner brought this action for injunctive and monetary relief in the United States District Court for the District of Maryland, contending that Nissan was engaged in an unlawful tying arrangement, and that Nissan had tortiously interfered with the business relationships between Faulkner and local Nissan dealer associations. On August 28, 1989, the district court granted Nissan's Rule 12(b)(6) motion to dismiss this case with prejudice, and Faulkner now appeals that decision.

## II.

Courts reviewing dismissals under Rule 12(b)(6) are guided by the long-estab-

1. In 1987, for example, Faulkner received approximately $35 million in advertising revenues from approximately forty local Nissan dealer associations. Total advertising expenditures by all local Nissan dealer associations in the United States for that year was approximately $80 million.

2. For a number of years, Nissan encouraged and supported local advertising of its vehicles by adding $100 to the dealers' cost for each car and truck, earmarking the money for advertising, distributing the funds to local dealer associations, and making additional contributions to their advertising budgets from time to time.

3. Chiat/Day has been providing national advertising services to Nissan since 1987.

4. Under its new local marketing plan, Nissan controls, through its Regional General Managers, all advertising funds which are collected from its dealers as part of the wholesale cost of its vehicles, determines the content of all local advertising which it authorizes, selects the media in which the advertising will be placed, and chooses the markets to which the advertising will be directed. In a memo sent to its dealers, Nissan explained that "[t]he purpose of this new advertising effort will be to provide a more consistent and concentrated retail level of advertising with a [Nissan selected] message."

lished rule that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957), *quoted in Thompson v. Brotherhood of Sleeping Car Porters,* 316 F.2d 191, 199 (4th Cir.1963); *see also District 28, United Mine Workers of America, Inc. v. Wellmore Coal Corp.,* 609 F.2d 1083, 1085 (4th Cir.1979). In reviewing the dismissal of a private antitrust action, this court has concluded: "We cannot sustain a complaint which does not allege with reasonable definiteness facts from which the court may infer conduct in restraint of trade of the kind prohibited by the antitrust laws, and from which an inference of public injury may reasonably be extracted." *Nelligan v. Ford Motor Co.,* 262 F.2d 556, 559 (4th Cir.1959). Most importantly, dismissals are reviewed *de novo* on appeal. *Revene v. Charles County Comm'rs,* 882 F.2d 870, 872 (4th Cir.1989).

### III.

■ A tying arrangement is an agreement whereby a seller conditions the sale of one product or service (the tying product) upon the buyer's purchase of a second product or service (the tied product). *Northern Pacific R.R. Co. v. United States,* 356 U.S. 1, 5–6, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958); *White v. Rockingham Radiologists, Ltd.,* 820 F.2d 98, 103 (4th Cir.1987). A tying arrangement which poses an unacceptable risk of stifling competition in the sale and purchase of a tied product or service constitutes a violation of our country's antitrust laws. *See Jefferson Parish Hosp. Dist. No. 2 v. Hyde,* 466 U.S. 2, 9 & n. 13, 104 S.Ct. 1551, 1556 & n.

13, 80 L.Ed.2d 2 (1984); 15 U.S.C. § 1 ("Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal."). In *Jefferson Parish,* the Supreme Court explained:

Our cases have concluded that the essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to force the buyer into the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms. When such "forcing" is present, competition on the merits in the market for the tied item is restrained and the Sherman Act is violated.

\*  \*  \*  \*  \*  \*

Accordingly, we have condemned tying arrangements when the seller has some special ability—usually called "market power"—to force a purchaser to do something that he would not do in a competitive market. When "forcing" occurs, our cases have found the tying arrangement to be unlawful.

466 U.S. at 12–14, 104 S.Ct. at 1558–59 (citations omitted).

■ In order to establish an illegal tying arrangement, a plaintiff must show that two separate and distinct product markets have been linked together, that the defendant used its market power to force its customers to accept the tying arrangement, and that the tying arrangement unreasonably foreclosed or restrained market competition in the tied product. *Jefferson Parish,* 466 U.S. at 18, 21, 104 S.Ct. at 1561, 1562; *Fortner Enterprises, Inc. v. United States Steel Corp.,* 394 U.S. 495, 506–08, 89 S.Ct. 1252, 1260–61, 22 L.Ed.2d 495 (1969).[5]

---

5. We note that both the coerced buyers and the other sellers of a tied product have standing to challenge a tying arrangement under Section 1 of the Sherman Antitrust Act. *Mandeville Island Farms, Inc. v. American Crystal Sugar Co.,* 334 U.S. 219, 236, 68 S.Ct. 996, 1006, 92 L.Ed. 1328 (1948) ("The statute does not confine its protection to consumers, or to purchasers, or to competitors, or to sellers. Nor does it immun-ize the outlawed acts because they are done by any of these. The Act is comprehensive in its terms and coverage, protecting all who are made victims of the forbidden practices by whomever they may be perpetrated.") (citations omitted); *Kelly v. General Motors Corp.,* 425 F.Supp. 13, 17 (E.D.Pa.1976); *cf. South Carolina Council of Milk Producers, Inc. v. Newton,* 360 F.2d 414, 418 (4th Cir.1966) ("If a plaintiff can

In the instant case, the sole issue in dispute is whether Faulkner properly alleged in its complaint that Nissan had linked together two distinct product or service markets in order to sell a tied product or service.[6] Nissan argues that it is engaged exclusively in selling cars and trucks, that its wholesale prices for those vehicles include a premium to pay for the company's own product advertising, that it is a purchaser rather than a provider of advertising services, that independent Nissan dealers and their associations are not precluded from buying additional advertising services from firms such as Faulkner, and that its new local market advertising program does not constitute an unreasonable restraint of trade. In contrast, Faulkner contends that Nissan has linked the sale of its vehicles with a comprehensive package of advertising services, that prior to the implementation of this new marketing program Nissan dealers obtained their advertising services from independent agencies such as Faulkner, that under Nissan's new plan Nissan dealers are effectively compelled to buy local advertising from Nissan and Chiat/Day, that many Nissan dealers would prefer to purchase their advertising services from Faulkner rather than from Nissan and Chiat/Day, that this new program is therefore an unreasonable constraint upon the market for advertising services, and that Nissan's new program constitutes an unlawful tying arrangement. In Faulkner's view, the tying products are Nissan's cars and trucks, the tied services include Nissan's new advertising efforts, and the tying arrangement is embodied in Nissan's local market advertising program. Summarizing the parties' respective positions, Nissan maintains that it is active in selling a single product (vehicles), while Faulkner insists that Nissan is selling two linked products (vehicles and advertising).

## IV.

The identification of two distinct products or services is often the greatest stumbling block for antitrust plaintiffs who have alleged a tying violation. *See, e.g., Southern Pines Chrysler–Plymouth, Inc. v. Chrysler Corp.*, 826 F.2d 1360, 1362–63 (4th Cir.1987); *Washington Gas Light Co. v. Virginia Elec. & Power Co.*, 438 F.2d 248, 252–53 (4th Cir.1971); *Nelligan v. Ford*, 262 F.2d at 557–58. As the Supreme Court noted in *Fortner Enterprises*, "[t]here is, at the outset of every tie-in case, including the familiar cases involving physical goods, the problem of determining whether two separate products are in fact involved." 394 U.S. at 507, 89 S.Ct. at 1260. In that case, the Court indicated that the sale of a tied product "may constitute such an inseparable part of the purchase price for the [tying] item that the entire transaction could be considered to involve only a single product." *Id.*

An example of a "single product" sale is the routine purchase of consumer goods on credit, even though the credit is typically extended only upon the purchase of the consumer goods. *See id.* In this illustration, the credit could be viewed as a tying service, and the purchases could be regarded as tied products, although we conventionally regard these two elements as merged parts of a single transaction.

In *Jefferson Parish*, the Court made the following observations comparing the sale of a single product to the linked sale of two distinct products or services:

---

show himself within the sector of the economy in which the violation threatened a breakdown of competitive conditions and that he was proximately injured thereby, then he has standing to sue under section 4 [of the Clayton Antitrust Act, 15 U.S.C. §§ 15 *et seq.*].").

6. It should be noted that the principal issue before the trial court was whether Nissan had a cognizable economic interest in the sale of advertising services by Chiat/Day under its new advertising plan, a markedly different question than the one before this court. In its brief, Nissan concedes that "if Faulkner has [properly] alleged that Nissan sold Chiat/Day's advertising services to the dealers, Faulkner need not allege any other economic interest in sales of the tied product." Appellee's Brief at 2 n. 1. Thus, this court need only decide whether Nissan was engaged in selling a tied product, such as advertising services, and not whether Nissan had an economic interest in that product.

Thus, the law draws a distinction between the exploitation of market power by merely enhancing the price of the tying product, on the one hand, and by attempting to impose restraints on competition in the market for a tied product, on the other. When the seller's power is just used to maximize its return in the tying product market, where presumably its product enjoys some justifiable advantage over its competitor, the competitive ideal of the Sherman Act is not necessarily compromised. But if that power is used to impair competition on the merits in another market, a potentially inferior product may be insulated from competitive pressures. This impairment could either harm existing competitors or create barriers to entry of new competitors in the market for the tied product.... 466 U.S. at 14, 104 S.Ct. at 1559 (citations omitted). The Court went on to emphasize that "the answer to the question whether one or two products are involved turns not on the functional relation between them, but rather on the character of the demand for the two items." 466 U.S. at 19, 104 S.Ct. at 1562 (citations omitted). In other words, if the sale of one item has foreclosed competition in the sale of another item, and there is sufficient demand for the purchase of the second item apart from the first item, the respective markets for those two items will be deemed, for antitrust purposes, to have been linked together. 466 U.S. at 21–22, 104 S.Ct. at 1562–63.

Thus, if a sales arrangement in one product market impinges upon competition in another market, a tying arrangement will be recognized.[7]

In *Jefferson Parish*, the Supreme Court suggested that the market interference test for determining product linkage should be applied from the viewpoint of the purchaser and not the seller. 466 U.S. at 19–20 & nn. 31–32, 104 S.Ct. at 1561–62 & nn. 31–32 (citing *Times–Picayune Publishing Co. v. United States*, 345 U.S. 594, 613–14, 73 S.Ct. 872, 883, 97 L.Ed. 1277 (1953), and *Fortner Enterprises*, 394 U.S. at 507, 89 S.Ct. at 1260). In other words, a tie-in arrangement exists if a seller links together "two distinct markets for products that were distinguishable in the eyes of buyers." *Id.* 466 U.S. at 19, 104 S.Ct. at 1562. From the perspective of Nissan's independent dealers and their local dealer associations, Nissan's new advertising plan does integrate what many of them consider to be two distinct markets, one for Nissan's vehicles and the other for advertising. Indeed, there is little doubt that the sale of Nissan cars and trucks under that company's new local market advertising program has caused an adverse competitive impact in what previously was an independent market for advertising services. Thus, under the Supreme Court's jurisprudence in tying cases, it is apparent that Nissan is engaged in selling a tied product, that Count I of Faulkner's complaint was sufficient to withstand a motion to dismiss,[8] and

**7.** A tying arrangement is illegal, however, only if the other two requirements for a tying violation are satisfied: the defendant has exerted its market power to force its customers to accept the tying arrangement, and the tying arrangement unreasonably forecloses or restrains market competition in the tied product.

**8.** Read together, Paragraphs 12, 13 and 18 of the Complaint set forth the alleged tying violation:

12. Nissan dealers are now required by defendant to contribute funds to Nissan to support the regional advertising program by the payment of increased wholesale (dealer) prices for Nissan automobiles. Nissan (and not the Nissan dealers) designates the markets where such advertising will be conducted and does not allocate funds collected from the Nissan dealers to the local markets served by those dealers. Thus, dealer payments under

the recently implemented advertising program are allocated by Nissan to any regional market it selects. Under the new program, Nissan receives a direct benefit by ordering the concentration of advertising expenditures in markets in which defendant has obtained poor penetration, while Nissan dealers in other markets are required to subsidize Nissan's marketing efforts in markets selected by Nissan.

13. Since the new program is financed by increased wholesale prices paid by Nissan dealers for Nissan automobiles, Nissan dealers are forced to participate in the new program. Numerous Nissan dealers have objected to Nissan's new advertising program.

\* \* \* \* \* \*

18. During the period of time covered by this Complaint, defendant entered into agreements and arrangements which unreasonably

that this case should have been permitted to go to trial to resolve the question of whether the tying arrangement was illegal.

## V.

■ As a final matter, Faulkner also asserts that the trial court erred in dismissing its tortious interference with business relations claim. Under Maryland law, this tort consists of four elements: "(1) intentional and wilful acts; (2) calculated to cause damage to the plaintiffs in their lawful business; (3) done with the unlawful purpose to cause such damage and loss, without right or justifiable cause on the part of the defendants (which constitutes malice); and (4) actual damage and loss resulting." *Natural Design, Inc. v. Rouse Co.,* 302 Md. 47, 71, 485 A.2d 663, 675 (1984). In *Purity Products, Inc. v. Tropicana Products, Inc.,* 702 F.Supp. 564, 575 (D.Md.1988), *aff'd,* 887 F.2d 1081 (4th Cir. 1989), the court held that the third element of the *Natural Design* test relating to malice "necessarily hinges on whether defendants' actions constitute a violation of federal or state antitrust laws." Thus, the court in *Purity Products* reasoned that a summary disposition in favor of the defendants was appropriate only in the absence of a demonstrable antitrust violation. We agree with the rationale of *Purity Products,* and thus believe that Faulkner's business tort action under Maryland law stands or falls along with its federal antitrust claims. Accordingly, we remand Faulkner's state claim along with its federal antitrust action.

## VI.

Based on the foregoing discussion, we hereby reverse the decision of the district court, and remand the case for trial.

REVERSED AND REMANDED.

restrained trade in the advertising of Nissan automobiles by requiring Nissan dealers to purchase services relating to the advertising of Nissan automobiles by Chiat/Day as a condition of the purchase of Nissan automobiles

K.K. HALL, Circuit Judge, dissenting:

The majority holds that a manufacturer may not increase its advertising budget, expend that budget as it sees fit, and include the increased cost in the price of its only product, without the risk of running afoul of the Sherman Act. Because the antitrust laws do not prohibit the conduct described in the complaint, I would affirm the district court's dismissal under Fed.R. Civ.P. 12(b)(6). Accordingly, I dissent.

## I.

Appellant Faulkner rests its argument that it has stated a Sherman Act tying claim on two paragraphs from its complaint:

12. Nissan dealers are now required by defendant to contribute funds to Nissan to support the regional advertising program by the payment of increased wholesale (dealer) prices for Nissan automobiles. Nissan (and not the Nissan dealers) designates the markets where such advertising will be conducted and does not allocate funds collected from the Nissan dealers to the local markets served by those dealers. Thus, dealer payments under the recently implemented advertising program are allocated by Nissan to any regional market it selects. Under the new program, Nissan receives a direct benefit by ordering the concentration of advertising expenditures in markets in which defendant has obtained poor penetration, while Nissan dealers in other markets are required to subsidize Nissan's marketing efforts in markets selected by Nissan.

13. Since the new program is financed by increased wholesale prices paid by Nissan dealers for Nissan automobiles, Nissan dealers are forced to participate in the new program. Numerous Nissan dealers have objected to Nissan's new advertising program.

from Nissan. Nissan possesses sufficient economic power with respect to the tying product, Nissan automobiles, to force Nissan dealers to purchase services relating to the advertising of Nissan automobiles by Chiat/Day.

In ruling on the motion to dismiss, the district court was of course bound to assume the truth of the factual allegations of the complaint. *Conley v. Gibson,* 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).[1] However, legal conclusions in a complaint do not immunize it from Rule 12(b)(6) dismissal, and the courts are clearly not required to accept the accuracy of such assertions of law. *District 28, United Mine Workers v. Wellmore Coal Co.,* 609 F.2d 1083 (4th Cir.1979). Faulkner's complaint abounds with legal conclusions and puffery (*e.g.,* it characterizes the payment of the price of a car as a "contribut[ion of] funds to Nissan to support the regional advertising program"), and courts should disregard these allegations when ruling on a motion to dismiss for failure to state a cognizable claim for relief.

Stripped to the facts alleged, Faulkner's complaint does not state a claim under the Sherman Act. Paragraphs 12 and 13 assert:

(1) Nissan has raised the wholesale prices of its automobiles in order to defray the cost of its increased advertising activities;

(2) Nissan dealers must pay the wholesale prices of automobiles;

(3) Nissan completely controls its own advertising expenditures;

(4) Dealers are not promised, and may not receive, *any* advertising in their particular market;

(5) The purpose of Nissan's new program is to concentrate advertising where it has had poor market penetration; and

(6) Numerous Nissan dealers have objected to the new program.

These factual assertions are woefully inadequate to establish an illegal "tying" arrangement. In the first place, the dealers have only purchased a single product, auto-mobiles. Faulkner alleges the legal conclusion that the purchase price of the automobiles includes a forced sale of advertising, but the *facts* it alleges belie its conclusion.

No dealer is promised a cent of advertising in its local market. Though this feature doubtless unnerves some dealers, the very opposite situation might conceivably implicate the antitrust laws—if a dealer were assured of receiving a certain amount of advertising from Nissan in proportion to the number of cars it purchases, a forced sale of advertising might occur. In this case, Nissan dealers purchase cars, and the price of each car reflects Nissan's internal overhead. Thus, Faulkner alleges an illegal "tying" of the purchase of a car to the purchase of the overhead.

In a sense, the dealers (and ultimately the retail purchasers) have "bought" Nissan's advertising, but in the same sense, they have bought the electricity that powers Nissan headquarters, the carpet on its floors, and the stapler in the CEO's desk drawer. The incurrence of these expenses by manufacturers and their inclusion in product prices is not "tying"; it is commerce.

## II.

Even if there were two separate products sold to the dealers in this case, and the purchase of one were conditioned on the purchase of the other, the arrangement would not necessarily be unlawful.

The answer to the question of whether petitioners have utilized a tying arrangement must be based on whether there is a possibility that the economic effect of the arrangement is that condemned by the rule against tying—that petitioners have foreclosed competition on the merits in a product market distinct from the market for the tying item.

---

1. The Supreme Court has expressed some dissatisfaction with the breadth of the *Conley* rule in antitrust cases.

> In making [the assumption that plaintiff can prove some set of facts in support of its claim], we are perhaps stretching the rule of [*Conley* ] too far. Certainly in a case of this magnitude, a district court must retain the

power to insist upon some specificity in pleading before allowing a potentially massive factual controversy to proceed.

*Associated General Contractors of California v. California State Council of Carpenters,* 459 U.S. 519, 528 n. 17, 103 S.Ct. 897, 903 n. 17, 74 L.Ed.2d 723 (1983).

*Jefferson Parish Hospital District v. Hyde,* 466 U.S. 2, 21, 104 S.Ct. 1551, 1563, 80 L.Ed.2d 2 (1984).

Therefore, to be illegal, Nissan's program must foreclose competition on the merits in the market for advertising.[2] The majority concludes that "there is little doubt" that the new program "has caused an adverse competitive impact in what was previously an independent market for advertising services." I must disagree. Paragraph 12 of the complaint alleges that the purpose of Nissan's new program is to concentrate advertising in markets where it has fared poorly. Nissan's letter to the dealers announcing the program states that it will provide "a more consistent and concentrated retail level of advertising with a 'buy Nissan now' message." In other words, Nissan was *dissatisfied* with the *merit* of local advertising in at least some markets, and concluded that it could better promote its product through the new program. To achieve its end, Nissan chose an advertising firm it felt could do the job. It did not choose Faulkner. I believe that these actions reflect competition on the merits in advertising.

On the other hand, Faulkner's interpretation of the Sherman Act will cause the Act to stifle the competition it is intended to protect. If Nissan is precluded from expending funds for advertising of its choice within the dealers' turf, then Faulkner (and other agencies serving the dealers) is shielded from competition, no matter how mediocre Nissan may consider Faulkner's efforts.

In *Jefferson Parish*[3], the Supreme Court was careful to remind us that "the Sherman Act does not prohibit 'tying'; it prohibits 'contract[s] ... in restraint of trade.' Thus, in a sense the question whether this case involves 'tying' is beside the point. The legality of petitioners' conduct depends on its competitive consequences, not on whether it can be labeled 'tying.'" 466 U.S. at 21 n. 34, 104 S.Ct. at 1563 n. 34. Nissan has purchased advertising from a firm that it apparently considers capable; Faulkner does not allege that Nissan's motivation was anything other than to obtain better advertising in markets where it sold few cars. I fail to see how these actions will restrain trade in the market for advertising.

### III.

Nissan has always purchased "national" advertising, used it wherever appropriate, and passed the cost along to customers. Neither Faulkner nor anyone else has challenged the legality of this practice. Now Nissan has expanded its efforts, because it apparently believes that it will sell more cars if it becomes more involved in marketing its product on the local and regional levels. The majority holds that these actions state a claim under the Sherman Act, if a retailer's advertiser has already staked out its territory, and Nissan's advertiser intrudes.

The antitrust laws protect competition, not the *status quo*. Because I believe that Nissan's program is not a "contract in re-

---

**2.** Faulkner defines the "tied" market as "the advertising of Nissan automobiles." I suppose that similar such narrow "markets" exist for the "factory rustproofing of Nissan automobiles" or the "cafeteria for Nissan headquarters employees." The Sherman Act is generally not concerned with such finite commerce. *Cf. Jefferson Parish,* 466 U.S. at 16, 104 S.Ct. at 1560 ("[W]e have refused to condemn tying arrangements unless a substantial volume of commerce is foreclosed thereby."). Moreover, it strikes me as odd that Nissan might somehow be required to maintain a "free market" in the advertising of its own product. Must it request bids for each new television commercial or magazine spread? Surely Nissan has the power to purchase all of its advertising from the single firm of its choice.

**3.** *Jefferson Parish* was a challenge to an exclusive contract between a hospital and a firm of anesthesiologists whereby all patients needing anesthesiological services at the hospital were required to use the firm, and no anesthesiologists not associated with the firm would be admitted to the hospital staff. The Supreme Court held that this arrangement did not violate the Sherman Act. *Jefferson Parish* illustrates the broad latitude a business has to structure and package its products and services without violating the antitrust laws. Nissan's advertising program, even if it is deemed "sold" to dealers, fits well within the permissible latitude.

straint of trade," I would affirm the district court's dismissal of Faulkner's claim.[4]

I respectfully dissent.

---

**4.** For the same reasons, I would affirm the district court's dismissal of Faulkner's state-law tortious interference claim.