**MONTGOMERY COUNTY ASSOCIATION OF REALTORS, INC.**

v.

**REALTY PHOTO MASTER CORPORATION, et al.**

Civ. No. L–90–2141.

United States District Court, D. Maryland.

Jan. 24, 1992.

Edward T. Colbert, Richard G. Kline, Suzanne M. Parker, Washington, D.C., Lawrence M. Garten, Baltimore, Md., and B. George Ballman, Gaithersburg, Md., for plaintiff.

Michael C. Blackstone and King & Nordlinger, Washington, D.C., and Thomas C. Lederman, Baltimore, Md., for counter-defendant Shannon & Luchs Co.

Jeffrey W. King and Keith J. Harrison, Washington, D.C., for defendant Realty Photo Master Corp.

LEGG, District Judge.

## INTRODUCTION

Before the Court is a motion for a preliminary injunction filed by defendant, counter-plaintiff Realty Photo Master Corporation ("RPM"). Invoking the Sherman Act, 15 U.S.C.A. § 1 et seq. (1973 and Supp.1991), RPM seeks to enjoin plaintiff, counter-defendant Montgomery County Association of Realtors ("MCAR") from adding photographs of properties to MCAR's computerized multiple-list database.

From a mainframe computer at its headquarters, MCAR now provides to its realtor members written information concerning properties, primarily residential properties, that are listed for sale. Using a teletype machine or a personal computer, MCAR's members can access MCAR's database through the telephone lines.

Beginning in January 1992, MCAR is adding to its database a photograph of each home that is listed for sale. MCAR will not provide the pictures as an optional feature subject to a separate charge. Instead, the pictures will be incorporated into the standard database that is furnished to all subscribers; MCAR will increase the price of the standard subscription to defray the increased cost of operating the upgraded system.

RPM is a company that takes photographs of residences that are listed for sale through MCAR. Its present customers include thirteen of MCAR's realtor members. Using a mainframe computer and the public telephone lines, RPM digitizes and transmits to its customers the photographs it has taken. RPM also provides its customers with software that merges the written multiple-list information (furnished by MCAR) and the pictures (furnished by RPM).

RPM complains that it will be put out of business unless the Court enjoins MCAR from adding photographs to its database. RPM's customers will no longer purchase its photograph service, RPM argues, if they automatically receive (and pay for) the photographs from MCAR.

As legal support for its motion, RPM contends that the written multiple-list information (the "words") and the photographs (the "pictures") are separate products and that it is illegal *per se* as a tying arrangement for MCAR to sell them as a package. Alternatively, RPM contends that adding photos violates the antitrust laws under the rule-of-reason test because the new database unreasonably restrains trade in the real estate photographic market.

The Court hereby denies RPM's motion for a preliminary injunction. This Court finds that the words and the pictures are not two separate products illegally tied together; instead, they are simply two components of one product, which is a database

of information concerning properties that are for sale. The words and the pictures describe the properties, albeit in different forms.

RPM's motion also falls short under a rule-of-reason analysis. MCAR, by providing pictures, will not unreasonably restrain trade in real estate computer services and software. Vendors vigorously compete to sell computer services and products to real estate associations and to individual realtors. MCAR's new database will not substantially lessen that competition.

## FINDINGS OF FACT

Following expedited discovery and the submission of briefs, the Court held hearings on three days in December 1991. Various members of the real estate industry testified, including:

David Hermreck, president of RPM;

John Gilbert, executive vice-president of MCAR;

John Pistacchi, president of Opticom Corporation;

James F. Sherry, a real estate broker and consultant;

Frederick Thoms, a real estate broker;

Stephen Snell, who is the executive director of the York County Board of Realtors; and

Dale Ross, who is a member of the board of directors of MCAR.

Based upon the testimony and documentary evidence, the Court, for the purpose of deciding RPM's motion for a preliminary injunction, finds as follows:

MCAR, a voluntary association of realtors [1] in Montgomery County, Maryland, operates a multiple-listing service. The association compiles and disseminates to its members a computerized database concerning real estate, primarily residential, that is for sale in and near Montgomery County.[2] The database includes information such as the residence's address, age, lot size, number of bedrooms and bathrooms, mortgage balance, asking price, and broker's commission.

MCAR makes its multiple-list database available to approximately 578 member "participants," who are, for the most part, real estate brokers. In the real estate industry, brokers operate through one or more licensed agents, who are formally affiliated with the broker.[3] Some large brokers have more than one hundred agents. MCAR charges its broker-participants [4] $275 per year for each "user" who has access to the multiple-list system. Generally, each of the broker's active agents is a "user," and the broker passes the subscription fee on to them. There are 5,826 users who have access to the MCAR database.[5]

The heart of MCAR's multiple-list service is an IBM mainframe computer located at MCAR's headquarters. Users can access the mainframe by telephoning the computer and dialing in their access code. After requesting information about a specific property, the user receives it on either a personal computer or a "dummy" terminal that functions like a teletype machine.[6] A

1. "Realtor" is a title only available for those who are members of the National Association of Realtors. The membership includes real estate brokers, agents, and others. Membership categories also exist for realtors outside Montgomery County.

2. Montgomery County, which is immediately north of the District of Columbia, is part of the Washington suburbs. The suburban D.C. real estate market includes not only Montgomery County, but other parts of southern Maryland and northern Virginia as well.

3. Real estate agents are not employees of the broker; rather, they are independent contractors.

4. Three hundred and ninety-two of MCAR's 578 participants are licensed in and operate in Montgomery County.

5. Eighty-six percent of the users are licensed in and operate in Montgomery County.

6. There are more than 2,300 terminals that access MCAR's database; of these, approximately 1,629 are dummy terminals and 678 are personal computers. Although MCAR sells and leases terminals and personal computers that are compatible with its mainframe, such equipment is also available from other vendors.

dummy terminal is capable of receiving and printing the data as transmitted by the mainframe. Users with personal computers can purchase software capable of manipulating the data. Real estate software, which is readily available from a variety of vendors, can, for example, sort properties by neighborhood or zip code, identify "comparables," and calculate estimated closing costs.

MCAR's multiple-list service has changed with the development of technology. Initially, MCAR prepared and distributed a separate index card for each listing. The front of the card contained written information; the reverse side was a photograph of the property. In time, MCAR replaced the index cards with books. Like the cards, the books included a written description and photograph of each listing. Although the books were useful, their drawbacks are apparent. They took up storage space, were cumbersome to use, and, in the fast-paced real estate market, were out of date as soon as they were printed.

By 1978, technology had advanced such that MCAR could computerize its listing service. The technology had an important drawback, however; it was too costly to digitize and transmit the photographs. Thus, users received only the written property description from the IBM mainframe. From 1978 to 1988, MCAR continued to publish the multiple-list books as a supplement to its computer service. In approximately 1988, however, MCAR discontinued them.[7] Thus, beginning in 1988, pictures of multiple-list properties were unavailable through MCAR; this created a business opportunity for RPM.

In 1988, RPM began offering a photographic service to MCAR's members. Us-

ing one of its customer's access codes, RPM dials up the MCAR mainframe each day to identify the new listings. RPM then photographs the properties and feeds the photographs into RPM's mainframe computer, which digitizes them and downloads them automatically into RPM's customers' personal computers.[8] RPM provides its customers with software that reassembles the digitized photographs, and displays them—in color—on the computer monitor. The software also integrates the picture with the written multiple-list information that the user receives from MCAR. Thus, the customer's computer can display, and print out, an image combining RPM's photograph and MCAR's database.[9]

In 1990, MCAR, upon learning that RPM was accessing its database, filed the instant complaint against RPM in this Court for alleged copyright infringement, trade secret misappropriation, and breach of contract. MCAR contends that it has a valid copyright in its data compilation and that it is illegal for RPM to access MCAR's mainframe, even though RPM does so as the agent of its user customers.

In September 1990, RPM filed a counterclaim naming as defendants MCAR, members of MCAR's board of directors, and others. RPM alleges that the counterclaim defendants have conspired to restrict trade, to boycott RPM, and to monopolize the market for listing services, all in violation of the Sherman Act. Then, in October 1991, after MCAR announced its plan to add digitized photographs to its database, RPM moved for a preliminary injunction prohibiting MCAR from upgrading its database.[10] In deciding the injunction motion the Court assumes, *arguendo*, that RPM is

---

7. Given the difficulty of using the books, demand for them had slackened to the point that MCAR could no longer justify the cost of printing them.

8. RPM offers its services only to users who have service access agreements with MCAR. In order to use RPM's service, the user must have a personal computer; the service will not work on a dummy terminal that has neither a screen nor memory. At present, RPM has approximately thirteen customers.

9. RPM's software is also capable of manipulating the data.

10. In the motion for a preliminary injunction, RPM is pressing only the claim that MCAR's new database constitutes an illegal tying arrangement; RPM's other claims will be considered later. The trial on the merits is scheduled for later this year.

**956**

legally entitled to tap MCAR's database as an agent of its customers.

Nationwide, there are hundreds of realtor associations that, like MCAR, operate multiple-list services for their members. Testimony at the preliminary injunction hearing established a clear technological trend, in which (i) associations replaced booklets combining words and pictures with a words-only computerized system, and (ii) associations are now enhancing the words-only database by adding on-line photographs.[11]

There are a number of companies that compete for association business by providing the necessary computer software, hardware, and photographic services. Generally, adding on-line photos requires several coordinated steps, including (i) replacing or upgrading the association's mainframe so that it can digitize and transmit pictures, (ii) creating software with which realtors can display and print the database, and (iii) photographing new listings and loading them into the association's mainframe.

The companies capable of providing these services and products include Boris Systems, Inc., Realty Innovators, Moore Data, PRC Realty Systems, Realtron, and React Services. These companies primarily market photographic services to associations; their market is nationwide and includes any association desiring on-line photos. RPM is one of a few, if not the only, vendor that markets a realty photo service at the realtor level.[12]

Over the past several years, MCAR has studied ways in which computers can better serve realtors. One such effort resulted in MCAR's *Computer for the 90s Phase II Report*.[13] Based upon these studies, MCAR, in the summer of 1991, appointed a committee of directors to locate vendors capable of providing photo enhancements to the database. After competitive bidding, Moore Data, Realty Innovators, and Opticom Corporation ("Opticom") were selected as finalists. After further study and negotiation, MCAR signed a contract with Opticom on November 1, 1991.

Opticom, a California company, is setting up an office in Montgomery County, which it will use as a base of operations for photographing properties. Under the contract, Opticom will upgrade, rather than replace, MCAR's mainframe. Additionally, Opticom will create software enabling users to access and manipulate the database.[14] Opticom will sell this "access" software to MCAR members at a reduced price.

One issue RPM raises is whether Opticom, as the author of the code transmitted by the association's mainframe, will be able to monopolize the market for access software. Mr. Pistacchi of Opticom testified that the mainframe code will be written in standard computer language, which other software companies can readily translate. In addition, Opticom's right to sell access software to users is nonexclusive. Thus, the Court is satisfied that software vendors

---

**11.** Stephen Snell, the executive director of the York County Board of Realtors, testified that in 1987 his association added on-line photographs to its database. He and other witnesses testified without contradiction that the clear trend among associations is to offer photographs.

**12.** RPM's management previously owned a company, Applied Management, that attempted to market at the association level, but was unsuccessful. Similarly, John Pistacchi, president of Opticom Corporation, testified that his company initially targeted individual realtors as potential customers for his realty photo service, but discovered that the true market was at the association level.

**13.** RPM contends that MCAR's surveys revealed little interest among its members for on-line photos; MCAR contends the opposite. This dis-

pute is of no particular relevance to the motion for a preliminary injunction. The record developed thus far shows that MCAR studied potential uses for computers and concluded that the addition of on-line photographs was desirable and economical. Contrary to RPM's claims, this Court is not persuaded that MCAR chose to add pictures for an ulterior reason such as harming RPM or decreasing competition among individual realtors.

**14.** Users with "dummy" terminals will be able to receive the photos on a facsimile machine. Those with personal computers and Opticom's software can display, manipulate, and print the entire database.

will be able to compete with Opticom in the access software market.[15]

Beginning in January 1992, MCAR will provide on-line photos to its participants at no additional cost. In July 1992, after the system is "debugged," MCAR will raise its subscription rate by $80 per user per year to recover, at least partially, the cost of the new service.[16] It is technologically possible for MCAR to offer the on-line photos to its members as an optional feature subject to a separate charge. To avoid the complexity of administering such a system, MCAR will transmit the photos as part of its standard database, whether an individual user wishes to receive them or not.

Unless enjoined, MCAR will provide a service that essentially duplicates RPM's. RPM justifiably anticipates that its present customers will cancel their contracts and that new customers will not be forthcoming. RPM, therefore, seeks to enjoin MCAR from offering the new database on the ground that the written multiple-list information and the pictures are two separate products that MCAR is illegally tying together in violation of the Sherman Act. Alternatively, RPM contends that MCAR is illegally restraining trade in photographic real estate services.

## DISCUSSION

### A. Standard for issuing a preliminary injunction

Governed under Fed.R.Civ.P. 65, a preliminary injunction is "an extraordinary remedy to be granted only if the moving party clearly establishes entitlement to relief sought." Murrow Furniture Galleries, Inc. v. Thomasville Furniture Indus., Inc., 889 F.2d 524, 526 (4th Cir.1989).

This Court must consider four factors in deciding whether to grant the motion: (i) the likelihood of irreparable harm to the moving party if the preliminary injunction is denied; (ii) the likelihood of harm to the opposing party if the relief is granted; (iii) the likelihood that the plaintiff will prevail on the merits; and (iv) the public interest. Blackwelder Furniture Co. v. Seilig Mfg. Co., 550 F.2d 189, 194–97 (4th Cir.1977); Direx Israel, Ltd. v. Breakthrough Medical Corp., 952 F.2d 802, 812 (4th Cir.1991).

The test is not mechanical; rather, the outcome depends upon a flexible interplay among all of the factors such that a strong showing in one area may compensate for a weak showing in another. Murrow, 889 F.2d at 527; Direx Israel, 952 F.2d at 813.

A court first must balance the likelihood of irreparable harm to the plaintiff against the likelihood of harm to the defendant. Blackwelder, 550 F.2d at 195. When the balance does not tip decidedly in favor of the moving party, that party must demonstrate a strong showing of likelihood of success on the merits. Direx Israel, 952 F.2d at 813. When, however, a decided imbalance of hardship tips in the movant's favor, the court should replace the likelihood-of-success test with a lesser standard. Specifically, the court must consider whether the plaintiff has raised questions going to the merits that are so "serious, substantial, difficult and doubtful" as to require further investigation. Blackwelder, 550 F.2d at 195.

### B. Balance of Hardships

In balancing the potential hardships, this Court finds that RPM will be more greatly harmed absent an injunction, than MCAR will be if an injunction is issued. Thus, the balance of hardships tips decidedly in RPM's favor.

David Hermreck, president of RPM, testified that MCAR's proposed service will harm RPM in two different ways. First, after MCAR announced its plans, some of RPM's current customers indicated they will discontinue the RPM service once the MCAR service is on line. In addition, pro-

---

**15.** There exists an active market for access software in the real estate industry. Vendors offering software that manipulates and augments multiple-list data include Tool Kit, Real MLS, Realty Board, MLS Link.

**16.** RPM contends that the price increase will not fully cover the increased cost. It is unnecessary at this stage to decide RPM's undeveloped argument that MCAR is engaging in a form of "predatory pricing."

spective customers who were investigating the RPM system have postponed their decision until they have the opportunity to inspect MCAR's system. Clearly, RPM will be severely harmed if it loses both its current clients as well as prospective ones.[17]

■ Ordinarily, economic injury is insufficient to establish irreparable harm because such injuries can be compensated for monetarily. Such is not the case, however, when the anticipated economic injury is of such severity that the company will be put out of business altogether. *See Fed. Leasing, Inc. v. Underwriters at Lloyd's*, 650 F.2d 495, 500 (4th Cir.1981) (when company "sought to preserve its existence," appellate court found no error in district court's granting of injunction).

Conversely, the Court finds that MCAR will not be irreparably injured if the injunction is granted. MCAR entered into its contract with Opticom after RPM had filed its motion for a preliminary injunction. Thus, MCAR decided to upgrade its database with knowledge that RPM was seeking to enjoin such a move. Additionally, MCAR's contract with Opticom provides a "breakaway" clause, which protects MCAR in the event that the Court enters an injunction.[18]

Even though the balance of harm weighs in favor of RPM, the Court recognizes that an injunction would, nonetheless, injure MCAR and its members. An injunction would prevent MCAR from providing, and its members from receiving, a service that the association considers valuable.

## C. Merits of RPM's Case

Because the balance of hardship decidedly favors RPM, the likelihood-of-success test is displaced, and RPM need only raise "serious, substantial, difficult, and doubtful" questions going to the merits. *Blackwelder*, 550 F.2d at 195. Even under this lesser standard, RPM has failed to prove the elements of its antitrust claims.

■ RPM alleges that MCAR's actions violate section 1 of the Sherman Act under two theories.[19] First, it asserts that MCAR's "tie-in" between the listing service and the photographic service is *per se* illegal. Alternatively, RPM claims that it is entitled to prevail even if the listing and photographic services do not constitute separate products, and argues under the rule of reason that MCAR's actions are an unreasonable restraint of trade.

By enacting section 1 of the Sherman Act, Congress did not attempt to create a specific list of anti-competitive activities that it wished to proscribe. Rather, in general terms, Congress outlawed unreasonable, anti-competitive behavior, leaving it to the courts to apply the Act to specific

---

**17.** MCAR disputes that RPM will be put out of business and contends that: (i) RPM derives income from sales of equipment and software and is, therefore, not financially dependent on sales of photographic services; (ii) it is not a certainty that customers will prefer the MCAR system; and (iii) RPM can stay in business by selling its services to real estate associations throughout the country.

In ruling on the preliminary injunction motion, the Court concludes that RPM, a local and apparently under-funded company, could not, as its president testified, withstand the loss of its principal source of revenue, which is derived from subscription fees.

**18.** Opticom's president, John Pistacchi, testified that his company has devoted substantial time, energy, and money to its contract with MCAR and reluctantly agreed to the "breakaway" clause to avoid losing the contract. The Court credits Pistacchi's testimony that his company

would be substantially injured by an injunction. Although Opticom is not a party to this case, the Court may consider hardship to it under the "public interest" prong of the *Blackwelder* test.

**19.** In order for the Sherman Act to apply, the challenged activity must substantially affect interstate commerce. In *Cantor v. Multiple Listing Serv.*, 568 F.Supp. 424, 430 (S.D.N.Y.1983), the court held that the multiple-listing service in Dutchess County affected interstate commerce by stimulating the volume of sales of residential and commercial properties. This Court likewise finds that while the sale of real estate is inherently local, MCAR's activities affect real estate markets in northern Virginia, southern Maryland, and the District of Columbia and facilitate the purchase of real estate by persons moving in and out of the Washington suburbs. Thus, the interstate commerce test is satisfied, and MCAR's actions are subject to the antitrust laws.

situations.[20] Section 1 states generally that "every contract, combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce among the several states ... is declared to be illegal." 15 U.S.C.A. § 1 (1973 and Supp.1991).[21] In this case, RPM seeks to categorize MCAR's enhanced database as an illegal tying arrangement which falls in the *per se* category.

■ In a concurring opinion, Justice O'Connor stated that "[t]ying is a form of marketing in which a seller insists on selling two distinct products or services as a package." *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 33, 104 S.Ct. 1551, 1569, 80 L.Ed.2d 2 (1983) (O'Connor, J., concurring). RPM alleges that MCAR is tying the listing information (the tying product) to the computer photographs (the tied product). Essentially, an invalid tying arrangement is found when the seller exploits its control over the tying product and forces the buyer to purchase an unwanted tied product. *Jefferson Parish*, 466 U.S. at 12, 104 S.Ct. at 1558.[22]

■ To establish an illegal tying arrangement, a plaintiff must show three things: "(1) that two separate and distinct product markets have been linked together; (2) that the defendant used its market power to force customers to accept the tying arrangement; and (3) that the tying arrangement unreasonably foreclosed or restrained market competition in the tied product." *Faulkner Advertising Ass'n v. Nissan Motor Corp.*, 905 F.2d 769, 772, *reh'g granted*, 917 F.2d 790 (1990), *aff'd*, 945 F.2d 694 (4th Cir.1991).

In order for a tying arrangement to be illegal *per se*, the plaintiff must satisfy all of the elements. If the arrangement lacks one of the three elements, it must be analyzed under the "rule of reason." The activity may still violate the antitrust laws, but only if the court finds it to be an "unreasonable" restraint of trade. *Jefferson Parish*, 466 U.S. at 29, 104 S.Ct. at 1567; *Times–Picayune Publishing Co. v. United States*, 345 U.S. 594, 73 S.Ct. 872, 97 L.Ed. 1277 (1953); *Foremost Pro Color, Inc. v. Eastman Kodak, Co.*, 703 F.2d 534 (9th Cir.1983), *cert. denied*, 465 U.S. 1038, 104 S.Ct. 1315, 79 L.Ed.2d 712 (1984).

1. Per Se Illegal Tying Claim: Two Product Markets

The burden is on RPM to demonstrate that the listing service and the photographs constitute different products. "The identification of two distinct products or services is often the greatest stumbling block for antitrust plaintiffs." *Faulkner*, 905 F.2d at 773.

---

**20.** Because the Sherman Act is concerned with anti-competitive behavior in the marketplace, courts are generally suspicious of cooperative arrangements among competitors, including associations of realtors. *See Wells Real Estate v. Greater Lowell Bd. of Realtors*, 850 F.2d 803 (1st Cir.), *cert. denied*, 488 U.S. 955, 109 S.Ct. 392, 102 L.Ed.2d 381 (1988); *United States v. Foley*, 598 F.2d 1323 (4th Cir.1979), *cert. denied*, 444 U.S. 1043, 100 S.Ct. 727, 728, 62 L.Ed.2d 728 (1980); *O'Riordan v. Long Island Bd. of Realtors, Inc.*, 707 F.Supp. 111 (E.D.N.Y.1988). Nevertheless, it is well recognized that associations benefit the entire real estate industry. Multiple-listing services make real estate a more liquid commodity by disseminating information, thus engendering a more realistic price structure in the residential real estate market. *See* Arthur D. Austin, *Real Estate Boards and Multiple Listing Systems as Restraints of Trade*, 70 Colum.L.Rev. 1325, 1329–30 (1970).

**21.** All contracts or combinations do, in some sense, restrain trade. Consequently, courts have construed section 1 of the Sherman Act to prohibit only those contracts or combinations that unreasonably restrain trade. In determining whether restraints of trade unreasonably restrict competition, courts have used two complementary methods of analysis: the *per se* rule and the rule of reason. "In the first category are agreements whose nature and necessary effect are so plainly anticompetitive that no elaborate study of the industry is needed to establish their illegality—they are 'illegal *per se*.' In the second category are agreements whose competitive effect can only be evaluated by analyzing the facts peculiar to the business, the history of the restraint, and the reasons why it was imposed." *National Soc'y of Professional Engineers v. United States*, 435 U.S. 679, 692, 98 S.Ct. 1355, 1365, 55 L.Ed.2d 637 (1978).

**22.** Put differently, whether an illegal tying arrangement exists depends on whether MCAR's actions foreclose competition on the merits in a product market distinct from the market for the listing information. *Jefferson Parish*, 466 U.S. at 21, 104 S.Ct. at 1562.

Given the complexity of modern business transactions, it is often difficult to determine whether two products exist. A study of case law in this area is instructive. Courts have been called upon to apply the tying analysis to a broad array of arrangements involving different products and services. A catalogue of these cases is found in IX Phillip E. Areeda, *Antitrust Law* (1991) and ABA Antitrust Section, *Antitrust Law Developments* (2d ed. 1984).

The leading Supreme Court cases include *Jefferson Parish; Fortner Enterprises, Inc. v. United States Steel Corp.*, 394 U.S. 495, 89 S.Ct. 1252, 22 L.Ed.2d 495 (1969); and *Times–Picayune.* In each case the Court first determined whether the challenged arrangement involved two separate products.

In *Jefferson Parish*, the Court found that because anesthesiological services were billed separately from and requested independently of other hospital services, two products existed. *Jefferson Parish*, 466 U.S. at 23, 104 S.Ct. at 1564. In *Fortner*, the Court held that an arrangement whereby credit was provided by one corporation on the condition that a product be purchased from a separate corporation involved two different products. *Fortner*, 394 U.S. at 507, 89 S.Ct. at 1260. Finally, in *Times–Picayune*, the Court upheld the publisher's requirement that advertisers buy coverage in both its morning and afternoon newspapers on the ground that only one product—readership—was being offered. *Times–Picayune*, 345 U.S. at 613, 73 S.Ct. at 883.

Lower courts have found the following products to be separate: *Faulkner Advertising Ass'n*, 905 F.2d at 774 (motor vehicles and an advertising program); *Mozart Co. v. Mercedes–Benz of North America, Inc.*, 833 F.2d 1342 (9th Cir.1987), *cert. denied*, 488 U.S. 870, 109 S.Ct. 179, 102 L.Ed.2d 148 (1988) (cars and replacement parts); *Digidyne Corp. v. Data Gen. Corp.*, 734 F.2d 1336 (9th Cir.1984), *cert. denied*, 473 U.S. 908, 105 S.Ct. 3534, 87 L.Ed.2d 657, *reh'g denied*, 473 U.S. 926, 106 S.Ct. 18, 87 L.Ed.2d 696 (1985) (computer software and central processing units).

In contrast, other courts have found that separate products did not exist in the following cases: *Southern Pines Chrysler–Plymouth v. Chrysler Corp.*, 826 F.2d 1360 (4th Cir.1987) (older and newer models of cars); *Hirsh v. Martindale–Hubbell, Inc.*, 674 F.2d 1343 (9th Cir.), *cert. denied*, 459 U.S. 973, 103 S.Ct. 305, 74 L.Ed.2d 285 (1982) (directory of attorneys and the advertising therein); *Washington Gas Light Co. v. Virginia Electric and Power Co.*, 438 F.2d 248 (4th Cir.1971) (arrangement in which electrical installation charges were reduced for contractors building "all electric houses" because only one product, electricity, was involved).

Courts determine whether separate products exist on a case-by-case basis, and generally focus on the following factors: (i) whether the sales practice is to sell the components separately or together; (ii) whether there are separate charges for the components; and (iii) whether it is more efficient to combine the components. *Jefferson Parish*, 466 U.S. at 24 n. 39, 104 S.Ct. at 1564 n. 39. Applying these factors to the instant case, the Court finds that the words and the pictures are simply components of one product—information. See *Times–Picayune*, 345 U.S. at 613, 73 S.Ct. at 883; *Washington Gas Light Co.*, 438 F.2d 248.

First, testimony established that the nationwide trend is for associations to sell the listing information and the photographs together as part of a standard database. The Court notes that the words and pictures have traditionally been sold and distributed together, either as index cards or multiple-list books. It was only because of the technological gap that the words were disseminated by computer but the photos were not. Now, it is technologically and economically feasible to rejoin these two components. The realtors who testified consider the words and pictures to be one product.

Second, historically, realtor associations sold words and pictures (through index

cards and booklets) for a unitary price. MCAR plans to charge a flat rate for its database.

Third, it is more efficient for realtor associations to provide photographic services for their members than it is for members to purchase such services individually.[23] The nationwide trend is for companies such as RPM and Opticom to market on-line photos at the association rather than the realtor level. RPM has targeted the wrong segment of the market and wishes the Court to insulate it from competition.

In *Jefferson Parish*, the Supreme Court looked to see if there were separate demands for the "two" products. 466 U.S. at 19, 104 S.Ct. at 1562. RPM has failed to identify a separate market demand for photographs without some way to integrate them into the multiple-list information. Therefore, there is no separate, independent market for pictures alone.[24]

In sum, the Court holds that the multiple-list information and the pictures constitute one product. Having found that there is only one product,[25] the Court need not consider the second and third prongs of the tying analysis.

### 2. Rule-of-Reason Analysis

RPM's claim is insufficient to meet the elements of a *per se* violation; nevertheless, the Court must also review the claim under the rule-of-reason analysis.[26] RPM could, therefore, prevail if MCAR's actions unreasonably restrained competition among vendors of computer photographic services.

The Court is aware of no authority addressing the precise facts now at issue. The following two cases, however, which have applied a rule-of-reason analysis to alleged anticompetitive activities involving real estate associations, frame the applicable rule-of-reason test.[27]

As stated in *United States v. Realty Multi–List, Inc.*, 629 F.2d 1351, 1370 (5th Cir.1980):[28] "the courts [may] reach and void on its face any significantly restrictive rule of a combination or trade association with significant market power, which lacks competitive justification or whose reach clearly exceeds the combination's legitimate needs."

In *Cantor v. Multiple Listing Serv.*, 568 F.Supp. 424, 430 (S.D.N.Y.1983),[29] the court framed the relevant issues as follows:

**23.** Although RPM has been in business since 1988, it has only thirteen customers. When MCAR's database is upgraded, on-line photographs will be available to all MCAR participants.

**24.** In order for RPM to market the pictures, it must access MCAR's database, and its software must physically combine the words and the pictures.

**25.** Under RPM's analysis, MCAR would be prohibited by section 1 of the Sherman Act from augmenting its database to include additional information if that augmentation had the ancillary effect of harming a company that had begun providing such information. The antitrust laws do not and should not prevent MCAR from improving its product. *Foremost Pro Color*, 703 F.2d at 542–43.

**26.** In *Times–Picayune*, the Supreme Court examined the advertising program under the rule-of-reason analysis after determining that no tying arrangement existed because there was only one product. 345 U.S. at 614.

**27.** *See also Thompson v. Metropolitan Multi–List, Inc.*, 934 F.2d 1566 (11th Cir.), *reh'g denied,* 946 F.2d 906 (1991); *Wells Real Estate v. Greater Lowell Bd. of Realtors*, 850 F.2d 803 (1st Cir.), *cert. denied*, 488 U.S. 955, 109 S.Ct. 392, 102 L.Ed.2d 381 (1988).

**28.** The issue was whether the multiple-listing services' membership criteria were illegal under either the *per se* rule or the rule of reason because they authorized the association to establish a group boycott directed against those real estate brokers who failed to qualify under them. *Realty Multi–List*, 629 F.2d at 1354. In concluding that the district court erred in granting summary judgment for the association, the court found that the membership criteria, on their face, created unjustified restraints on commerce. *Id.* at 1388–89.

**29.** Two real estate brokers successfully challenged, on antitrust grounds, a by-law of the Multiple Listing Service of Dutchess County, Inc., which required that only a standard blue and white "For Sale" sign could be posted on any residential property. The rule had the effect of precluding plaintiffs from posting their distinctive "Century 21" lawn signs on listed properties, and thus was an unreasonable restraint of trade. *Cantor*, 568 F.Supp. at 431.

962

The Supreme Court has enumerated a number of factors which the Court must consider in assessing whether a restraint merely regulates or suppresses competition. These include the nature of the business to which the restraint is applied; its condition both before and after the restraint was imposed; the nature, effect and history of the restraint; the evil which it was intended to remedy; the reason for choosing the particular remedy and the end sought to be achieved. *Chicago Board of Trade [v. United States]*, 246 U.S. [231] at 238 [38 S.Ct. 242, 243, 62 L.Ed. 683] [ (1918) ].

■ Applying these standards to this case, the Court holds that MCAR's actions do not unreasonably restrain trade in photographic services. The relevant facts have been discussed elsewhere in this opinion and need only be summarized here.

In providing on-line photographs to its members, MCAR is restoring a part of its database (the photographs) that was omitted for a short time because of a gap in technological capability. By adding on-line photographs, MCAR is following a clear industry trend.

The photographs will be useful not only to users of MCAR's multiple-list service but to the public as well. Multiple-list services create a more liquid real estate market by providing information to realtors and potential buyers; the more information, the better. Arthur D. Austin, *Real Estate Boards and Multiple Listing Systems as Restraints of Trade*, 70 Colum.L.Rev. 1325, 1353–54 (1970).[30]

The Court first finds that MCAR's actions do not unreasonably restrain the market for photographic services. The true market is at the association, rather than

the realtor, level. Opticom, for example, competes in this market with a number of other vendors nationwide. Potential customers abound because associations throughout the country are in the process of, or exploring the feasibility of, upgrading their databases to include on-line photographs. MCAR's actions do not foreclose RPM from competing for this business if it so chooses.

MCAR's new database also will not unreasonably restrain the market for access software. Opticom is writing the mainframe code in standard computer language, which other software companies can readily translate. Thus, RPM and other companies will be able to compete with Opticom for sales of access software to MCAR's members.[31]

Relying on *Cantor*, RPM contends that MCAR's actions will eliminate competition among the realtors themselves. RPM argues that its customers enjoy a competitive advantage over realtors that cannot now offer photographs. MCAR will reduce competition by levelling the playing field, RPM concludes.

RPM's reliance on *Cantor* is unjustified. First, RPM, which is not a real estate broker or agent, may lack standing to argue that competition among realtors will be eliminated by MCAR's plan. More importantly, *Cantor* is readily distinguishable on the facts. Therein, the Dutchess County association mandated that all realtors use the same sign. This restriction eliminated the opportunity for realtors to capitalize on the goodwill and favorable image associated with their firms' distinctive signs. *Cantor*, 568 F.Supp. at 430.

In this case, there is no similar requirement imposed by MCAR. Realtors are

**30.** The types of information in MCAR's database can be analogized to the products and services provided by a franchisor. Tying claims have frequently arisen in the context of franchisor-franchisee relations. In *Principe v. McDonald's Corp.*, 631 F.2d 303, 309 (4th Cir.1980), *cert. denied*, 451 U.S. 970, 101 S.Ct. 2047, 68 L.Ed.2d 349 (1981), the court noted that "the very essence of a franchise is the purchase of several

related products in a single competitive package." Here, the words and the pictures form a single, competitive package, the database.

**31.** In fact, increasing the information in the database increases the opportunities for vendors to manipulate the new information through improved software.

free to decide whether to purchase the equipment and software needed to receive and duplicate the photos. The realtors are also free to decide in what manner the photos are to be received—via fax or computer. Additionally, it is likely that realtors will be able to distinguish themselves by selecting from a variety of access software packages that should become available in the future. MCAR's plan thus preserves the realtors' ability to conduct business as they see fit. *Cantor*, 568 F.Supp. at 430. While MCAR's new database may diminish competition among realtors to some extent, the Court finds that any adverse affects are greatly outweighed by the benefits and opportunities the new database offers the real estate industry and the public.

In sum, the Court holds that MCAR's actions do not, when tested under the rule of reason, unreasonably restrain trade.

### D. *Public Interest*

For the reasons stated herein, the Court also finds that the public interest is served by permitting MCAR to add photos to its database.

### CONCLUSION

For the foregoing reasons the Court will enter a separate order denying RPM's motion for a preliminary injunction.